**Samuele T. STEVENS, Jr., Appellant,**

v.

**WARDEN, MARYLAND PENITEN-
TIARY, Appellee.**

**No. 10005.**

United States Court of Appeals
Fourth Circuit.

Argued June 24, 1966.

Decided Aug. 30, 1967.

Richard M. Squire, Baltimore, Md. (court-assigned counsel), for appellant.

Jon F. Oster, Asst. Atty. Gen. of Maryland (Thomas B. Finan, Atty. Gen. of Maryland, on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and J. SPENCER BELL,* Circuit Judges.

HAYNSWORTH, Chief Judge:

Stevens, a Maryland prisoner sentenced to a term of twenty years upon a conviction of armed robbery, sought habeas corpus complaining of his representation in the trial court and of the sufficiency of the evidence to support the conviction. The sentence is shocking, but the conviction is unassailable on constitutional grounds.

In denying the petition, the District Court carefully considered the facts,[1] so that we may treat them more summarily here.

In the early hours of a Sunday morning after a Saturday evening's carousal, two Negroes got in an argument over $47. Barnes, the alleged victim, claimed the sum was taken from him by Stevens, substantially a stranger to him, at knife point. Stevens denied it, though claiming some other difficulty between the two after an evening spent as drinking companions.

Barnes, who had been drinking, approached a policeman sometime after midnight with a complaint that a Negro, whom he did not know but whom he had seen before and could identify, had robbed him of $47. Barnes told the policeman that his assailant had been armed with a butcher knife, and that there had been a scuffle in an alley. In the alley, the policeman found a butcher knife and a cap belonging to Barnes. Led by Barnes to the 700 block of Eislen Street in Baltimore, they found, after two or three tries, the house where the defendant lived. He was not at home, but presently Stevens, wearing a woman's green coat with a torn pocket, arrived in a taxicab with several packages. Barnes identified him as his attacker, and the three entered the house.

At the policeman's request, Stevens produced from his pocket $33 which he claimed he had just collected from a "Miss Elsie" for some painting work Stevens had done. He told the officer, in the presence of Barnes, that he and Barnes had met in a tavern earlier that night, that the two had spent several hours drinking together in Stevens' house, and that his landlady had forced Barnes to leave after objecting to the coarseness of his language. The landlady was present, and she corroborated Stevens in his statement of Barnes' presence earlier that night.

Barnes then offered to withdraw his charge and forget the whole thing if Stevens would pay him $47. Stevens declined to pay him anything on the ground that he owed him nothing.

At the trial, the story that Barnes told was supported in a material part by a witness who said he had seen Stevens and Barnes scuffling on a lighted porch off the alley. Stevens testified to his version of the events of the evening, and his version was partially corroborated by the policeman who testified that Stevens' landlady had affirmed Stevens' assertion that Barnes had spent several hours drinking with Stevens in her house that night.[2]

Conviction followed, and it was affirmed on appeal.[3] Later, postconviction relief was denied.[4]

■ There is no substance in the contention that the trial record was so devoid of evidence of guilt as to offend the constitutional standard to be applied in a collateral proceeding. Barnes positively testified that Stevens grabbed him from behind and dragged him into an alleyway

---

* Judge Bell expressed approval of the result in this case, though he died before this opinion was prepared.

1. Stevens v. Warden, D.C.Md., 238 F. Supp. 334 (1965).

2. Barnes denied that he had been there. He claimed he did not know Stevens, but

had seen him several times in the 700 block of Eislen Street and, for that reason, thought he lived there.

3. Stevens v. State, 230 Md. 47, 185 A.2d 194 (1962).

4. Stevens v. Warden, 235 Md. 684, 202 A. 2d 598 (1964).

and up a stairway to a porch, that Stevens held a butcher knife to his throat and took his $47. At some point in the struggle, the knife was dropped and Barnes claimed that, in his attempt to retrieve the $47, he tore the pocket of the lady's green coat that Stevens was wearing. An occupant of the apartment testified that he stepped out on the porch, recognized Stevens and Barnes, and told them to stop, after which Barnes left, saying he was going to get a policeman, and Stevens also departed. The witness saw no knife and saw no robbery, but he unequivocally confirmed the prosecuting witness's testimony about the scuffle on the porch off the alley.

The testimony for the state, accepted by the trier-of-fact as true, was quite sufficient to make out the offense, as the Maryland Court of Appeals held on the direct appeal. It certainly meets the constitutional standard we must apply.[5] In making this contention, Stevens relies in part upon the verity of some of the testimony favorable to the defense, which is impermissible, and upon an asserted lack of sufficiency of the identification of the knife. Barnes testified that the knife shown to him at the time of the trial looked like the one Stevens had used when committing the robbery, but the policeman, who retained possession of the knife after he picked it up, positively testified that the knife was the same one. There was no defect in its admission as evidence.

An attack is made upon the competency of Stevens' trial counsel. He had not long been admitted to practice, but he had handled several criminal cases, and the record here discloses a competent and faithful performance.

It is objected that the lawyer did not call Stevens' landlady. She had died before the postconviction hearing in the District Court, but the lawyer talked to her before the trial and was told by her that she would not testify that Barnes had been with Stevens in her house on the night in question. She mentioned the laws of perjury. Under the circumstances, it would have been quite foolish for the lawyer to call her as a witness when he could get from the policeman the fact that, at the time of the confrontation, the landlady had corroborated Stevens' claim that Barnes had been drinking with him in her house that evening.

The lawyer did not call "Miss Elsie" either. Had she appeared and testified that she had paid Stevens $40 that night, as Stevens claimed, it certainly would have been helpful to him, but there is every indication that "Miss Elsie" was a phantom. Stevens told his lawyer that the landlady could find "Miss Elsie" for him, but the landlady told him she could not and, implying that "Miss Elsie" was a nonexistent person, advised the lawyer not to waste his time attempting to look for her. During the initial investigation of the matter, the policeman went to the street where Stevens claimed that "Miss Elsie" lived and inquired at several houses, but could find no person by that name, and no one who had recently had four rooms painted. Stevens disparages the fact that the policeman did not find "Miss Elsie" by picking at his testimony to draw the inference that the policeman must have gone to the wrong houses and inquired for "Miss Elsie" by another name, but neither he nor his new attorneys could produce her at the postconviction hearings. The fact that she has not now been produced strongly confirms trial counsel's understanding, acquired from the landlady, that "Miss Elsie" was a figment.

Fault is also found with the lawyer because of the fact that the record of the trial indicates that he took no advantage of the opportunity to make a statement in mitigation of the offense, but that neglect did not so impair the fairness of the proceedings as to conflict with the due process standards. The Judge heard Stevens testify at length. He knew his claim of innocence as well as his record of petty offenses, but not of crimes of violence. It

---

5. Grundler v. State, 4 Cir., 283 F.2d 798; Faust v. State, 4 Cir., 307 F.2d 869.

would have been better by far if the lawyer had exercised the right of allocution, but his failure to do so raises no constitutional question.[6]

We find no unfairness in the trial proceedings through the return of the jury's verdict. The Court's charge is subject to no exception; it quite adequately informed the jury of the defendant's rights and of the presumption of innocence with which he was clothed. What is wrong in this case is the sentence.

In sentencing Stevens, after noting that his prior convictions were "not for this type of offense," the Court imposed upon him the statutory maximum sentence of twenty years. Judge Carter stated: "The only way I can let you and the others know the attitude of this court in these matters is to impose the sentence I usually impose. The sentence is twenty years in the Maryland Penitentiary." The *usual* imposition of the statutory maximum sentence for armed robbery, applied in a case of this sort, is a negation of judicial responsibility and the active cause of much fruitless postconviction litigation in the state and federal courts.

The record leaves us with no conviction that Stevens' version of the events of that night was true. During the postconviction hearing in the District Court, it was established beyond question that Stevens was lying when he testified repeatedly that he had known Barnes when both of them were confined at the same time in the Maryland House of Detention. Each had been confined there, all right, but never at the same time. It appears highly probable, too, that Stevens was lying when he claimed that Barnes had been drinking with him in his landlady's house earlier that night and when he

asserted the claim that he had collected the money he had in his possession from "Miss Elsie" for painting work that he had done. One is also left with a decided sense of skepticism about Barnes' story. It is rather incredulous that Barnes with a number of convictions for assault upon police officers and others, and other crimes of violence, could be dragged by the neck up an alley and a stairway to a porch by a man affecting a female outer garment and with a record of convictions for homosexual acts but of no crime of violence. It is understandable that Barnes might have submitted to this at knife point, but the knife was dropped in the alley before the porch was reached. If Stevens was bent on robbery, it was certainly senseless to select an acquaintance [7] as his victim and drag him to the lighted porch of an apartment where both Stevens and Barnes were known and where Stevens was certain to be recognized by his victim and, probably, by occupants of the apartment.

However unlikely it may seem to us that Barnes, with his history of violence, submitted thus meekly to the apparently effeminate Stevens, with his history of no violence, and that Stevens came into possession of his money in that fashion,[8] it was not inappropriate for the trial court to impose a sentence upon the assumption that the facts as found by the jury were true and that they fully agreed with the victim's testimony. It is inescapable, however, that if Stevens did the acts as charged by Barnes, he was acting entirely out of character. His criminal record of solicitation for prostitution and for homosexual acts is long, and he had one conviction for the theft of some clothing. A homosexual panderer, he is far from a nice fellow, but if he committed the act

---

6. Hill v. United States, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); McGrady v. Cunningham, 4 Cir., 296 F.2d 600.

7. While Barnes testified he did not "know" Stevens, he admitted he had seen him several times and he was able to lead the policeman to the house where Stevens lived. In the hearing in the District Court, the policeman testified that, when

making his first complaint, Barnes referred to Stevens by his nickname, Florida Boy. Stevens claimed, of course, that the two were well known to each other.

8. It would be readily believable if Stevens took the money from Barnes by stealth or trickery. If he did, bearing in mind Stevens' record of pandering and homosexual activity, Barnes may not have wished to admit the circumstances.

of armed robbery for which he was convicted, it was a first offense, wholly out of keeping with his past record.

When there has been an armed robbery and the victim is relieved of all of the money on his person, it matters little whether he had $47 or $470, but when the facts were sharply disputed and the victim and arresting officer were willing to withdraw all charges upon the payment of $47, the case approaches a $47 case, far too trivial for anything approaching a maximum term of imprisonment.

■ The whole concept of modern sentencing procedure calls for the exercise by the sentencing judge of a high order of discretion to fit the sentence to the crime and to the defendant. "Usual" and routine imposition of the statutory maximum sentence upon first offenders and others who stand substantially in that position without regard being had to the nature and character of the offense and to the defendant's record and personality seems an abrogation of responsibility and a negation of the discretion which the law vests in the trial judge.

It has detrimental consequences. If a sentence of two to three years had been imposed upon Stevens, even one of four or five, this case probably would not have required the subsequent attention of trial and appellate judges in both state and federal courts. With a sentence of twenty years, it is little wonder that Stevens feels aggrieved and with sufficient justification to persistently seek his release by every judicial proceeding to which he may resort. That is not the only consequence of such sentences, however, for they furnish the most convincing argument which the proponents of appellate review of sentences could wish,[9] though most trial judges, initially at least, line up in opposition to the proposal. Such injudicial harshness cries for a remedy to right it.

■ Meanwhile, however, the federal courts have no right to review any sentence of a state court which does not exceed the statutory maximum sentence which may be imposed under the laws of the state. Since the only thing wrong with the entire proceedings was the sentence, we are powerless to afford relief.

Affirmed.

---

9. See the Report of the American Bar Association Project on Minimum Standards for Criminal Justice on Standards Relating to Appellate Review of Sentences (tentative draft 1967). This case might well head the small list of horrible examples, to which reference is made on page 22. The problem of the grossly excessive sentence has already led a number of states to provide some means of reviewing them, as disclosed in the Report. See also S. 1540 (90th Cong. 1st Sess.) introduced by Senator Hruska, providing for appellate review of federal sentences, which was passed unanimously by the Senate on June 29, 1967.