Johnny Mack THACKER, Petitioner,

v.

The STATE OF SOUTH CAROLINA and the Attorney General of the State of South Carolina, Respondents.

Civ. A. No. 77–1010.

United States District Court,
D. South Carolina,
Columbia Division.

Sept. 20, 1977.

Johnny Mack Thacker, pro se.

Emmet H. Clair, Asst. Atty. Gen., Columbia, S. C., for respondents.

### ORDER

BLATT, District Judge.

The petitioner is serving a sentence in North Carolina which commenced after he escaped from the South Carolina Department of Corrections in 1968. He was committed to the Department by the Court of General Sessions for Newberry County, the Honorable J. B. Ness, Presiding Judge, after he was found guilty of armed robbery on September 21, 1967. For an offense carrying a maximum sentence of twenty-five years, Judge Ness sentenced the petitioner to twenty-one years. No direct appeal was taken.

A prior petition for a writ of habeas corpus by the petitioner was dismissed by Order filed in Civil Action No. 76–1034 on August 27, 1976. At that time, the petitioner was awaiting the decision of the South Carolina Supreme Court on his appeal of a denial of post-conviction relief by

the Honorable Francis B. Nicholson, Resident Judge for the Eighth Judicial Circuit of South Carolina, making it clear that state remedies had not been effectively exhausted. The Supreme Court on May 2, 1977, affirmed Judge Nicholson's decision in Memorandum Opinion No. 77–37, *Thacker v. State.*[1] Accordingly, as to all grounds raised in his state application, the petitioner has now exhausted his remedies in the courts of the state, as required by 28 U.S.C. § 2254.

The petitioner has alleged four grounds for relief in his petition filed in this court on May 30, 1977. Before reviewing these grounds, it is appropriate to review the evidence of the crime for which petitioner was convicted, and the circumstances of his arrest, and the events that transpired shortly thereafter, including appointment of counsel.

Between 11:15 a. m. and noon on July 13, 1967, Mrs. Ida Mae Neel of Newberry left her job to drive home for lunch in her 1966 Plymouth automobile. She noticed nothing amiss upon arrival at the home she shared with her husband, who was at work at the time. She began preparing lunch, and while going to her bedroom a few minutes later, she caught a fleeting glimpse of a black male clad in a white shirt just before he struck her with a pistol. She recalls grasping for her assailant, but nothing else about the encounter. She could not identify her attacker, but she specifically recalled that she left her car keys in her pocketbook in the kitchen, and that she had $8.00 in the house, in denominations of one five dollar bill and three one dollar bills. Mr. Neel found his unconscious wife when he came home a short time later. She was transported to a hospital where it was determined that she had been struck on the head in two places, causing a skull fracture and a severe concussion. Mr. Neel testified that he had left home after his wife that morning, and that all doors were locked when he

---

1. One of petitioner's contentions here is that he was denied a direct appeal. The Supreme Court reviewed the entire record, including all issues that could have been raised on direct appeal, thereby granting belated appellate review. *Cf., Patterson v. Leeke,* 556 F.2d 1168 (4 Cir. 1977).

left. After he returned home and discovered his injured wife, he determined that a rear screen door had been cut, and the door unlatched through the cut area. His wife's yellow Plymouth was not at their home when he found her there unconscious, and two pistols he kept in their bedroom were missing.

Early police investigation uncovered the fact that several neighbors or near-neighbors of the Neel couple had seen a black male wearing a white shirt[2] in the vicinity of the Neel home before and after the time fixed by Mrs. Neel as the time she was assaulted. Three witnesses stated that they saw the male either driving Mrs. Neel's Plymouth or parked by the side of the road leading from the Neel residence to U.S. Highway 76 near the Newberry Airport.[3] Two other witnesses stated that they had a close view of the defendant when he stopped at their home for a drink of water before leaving by foot walking toward the Neel residence.[4] Four of these five witnesses positively identified the petitioner, Johnny Thacker, as the person they saw in the vicinity of the Neel home, or in Mrs. Neel's car, about the time of the incident in which Mrs. Neel was struck and robbed.

At approximately 1:00 p. m. on July 13, 1967, a man later positively identified as the petitioner wrecked Mrs. Neel's Plymouth in the 1700 block of Gadsden Street in Columbia, near the Interstate 26 exit off the route to Columbia from Newberry. The occupant fled the scene after the officer saw him reach into the glove compartment of the Plymouth. A short time later, the petitioner was seen at the Federal Courthouse, where he was apprehended after being shot by a Columbia policeman on the edge of the court house parking lot.[5] A pistol identified by serial number as one of the two pistols taken from the Neel home was lying near the petitioner, and he had eight dollars in currency in his pocket, consisting of one five dollar bill and three one dollar bills.

On the afternoon of petitioner's arrest, one of the Newberry witnesses who saw a black male driving Mrs. Neel's Plymouth was brought to Columbia by Newberry officers to determine if he could identify Thacker.[6] He made the identification after viewing the left profile.[7]

About two weeks later, the two Johnson women also made stationhouse identifications of Thacker in Newberry as the young man who stopped at their house for a brief chat and sought a glass of water on the day Mrs. Neel was robbed and hit on the head.

Although the petitioner's attorneys fully cross-examined the State's eyewitnesses, no motion to suppress identification evidence because of suggestive showups was made.[8] This omission is the core of the petitioner's claims for relief here. He alleges that the showups without notice to his counsel vio-

---

2. One witness told an officer the shirt had floral designs on it.

3. These witnesses were Buck Gause (Tr. of Record on Appeal, pp. 103 et seq., as numbered by machine), Mrs. Myrtle Jones (Tr. 121 et seq.), and Mrs. Dot Bagwell (Tr. 127 et seq.)

4. Mrs. Eunice Johnson (Tr. 76 et seq.), and Shirley Ann, her daughter (Tr. 87 et seq.)

5. The circumstances of the shooting are not revealed in the record other than a disclosure that the petitioner had been shot in the foot. The officers who apprehended Thacker removed some of his clothing, including the shirt he was wearing, to ascertain the extent of his wounds. The State offered to introduce the clothing at trial but the defense declined the offer. Tr. 188.

6. See testimony of Buck Gause, Tr. 112 et seq.

7. On July 13, 1967, counsel had not been appointed for Thacker. Judge Nicholson appointed Messrs. Robert C. Lake and James N. Parr on July 14, 1967. See Tr. 228. The petitioner was a suspect, obviously, because he had the robbery victim's Plymouth automobile, but he was not charged in a warrant until July 21, 1967, according to his petition.

8. It is undisputed that the Newberry Sheriff's officers did not inform attorneys Lake and Parr of plans to have the witnesses view Thacker at jail to see if they recognized him as the man who stopped by their house. As Judge Nicholson pointed out in his Order of June 2, 1976 (Tr. 221–229), Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), announcing prospective application only of United States v. Wade and Gilbert v. California, had been decided approximately one month earlier.

lated his rights under the Sixth Amendment, and that all identification testimony should have been suppressed because the one man showups were so impermissibly suggestive that they gave rise to a very substantial likelihood of irreparable mistaken identification, in violation of his right to due process. In addition, the petitioner claims that he was denied the effective assistance of counsel in several particulars. He lists the failure of his trial attorneys to seek the suppression of the allegedly tainted eyewitness testimony, the lengthy delay between the date of his attorneys' appointments and their initial interviews with him,[9] the efforts of the attorneys to obtain releases from his case,[10] and what he contends to be an inhibited defense effort, lacking the degree of advocacy he would expect and prefer.[11]

█ The petitioner's grounds were fully discussed by Judge Nicholson in his Order denying post-conviction relief [12] entered af-

ter a hearing on the case (Tr. 221–229).[13] The court agrees with Judge Nicholson's analysis of the issues involved with the exception of a portion of the discussion concerning pretrial identification. This court notes at the outset, since petitioner's counsel did not object at trial to the introduction of the showup testimony, *Wainwright v. Sykes*, —— U.S. ——, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), such failure to object would normally bar habeas corpus review of this issue for failure to comply with the South Carolina "contemporaneous objection rule." *See, State v. Davis*, 267 S.C. 456, 229 S.E.2d 592, 593 (1976). However, in the present case, the rationale for application of the *Wainwright v. Sykes* rule, hesitation to impinge on legitimate state procedures, is missing, because the state has already considered the contentions concerning the showups in an application for state post-conviction relief. In addition, the South Carolina Supreme Court opinion reviewing the post-conviction Order merely

---

**9.** The attorneys conferred "at length" with the petitioner for two or more days prior to the trial (Tr. 47–48).

**10.** The petitioner himself asked for the attorneys to be relieved for reasons "not detailed" even though he was at the counsel table and said nothing. Judge Ness denied the motion (Tr. 48–49).

**11.** The petitioner offered no defense, and exercised his right to decline to testify (Tr. 187), but the trial record refutes his contentions that his attorneys lacked an acceptable degree of advocacy. They conducted meaningful cross examinations where tactically required, endeavored to obtain a change of venue at the petitioner's specific request, and sought a continuance to try to locate a witness for the petitioner. No showing was made to justify a change of venue (Tr. 45, et seq.). Judge Ness denied the continuance after several witnesses told of concerted efforts to locate the witness "Frank Robinson." (Tr. 36–42). Robinson, from all appearances, was a "phantom witness." *Cf., Stevens v. Warden*, 382 F.2d 429, 431 (4 Cir. 1967), *cert. den.* 390 U.S. 1031, 88 S.Ct. 1423, 20 L.Ed.2d 288 (1968). Therefore, the only facially valid criticism of the two defense attorneys is the petitioner's claim that they should have sought suppression of the identification of some of the eyewitness identification testimony. In view of the court's disposition of the identification issue, the failure to object to this testimony did not prejudice the petitioner in any way.

**12.** Unfortunately, no transcript of the post-conviction hearing is available, an omission which the petitioner argues in his traverse filed on June 15th. However, nothing that occurred during that hearing affects the eyewitnesses' testimony given at the trial nine years earlier, and it is to the trial testimony that the court must turn in order to determine whether the petitioner's rights of due process were violated. It is wholly apparent, as Judge Nicholson held, that the Newberry Sheriff's office defaulted in their duty to contact Thacker's attorneys before arranging a stationhouse showup for the Johnson women to determine if they could identify him. (See letter of July 12, 1977, from petitioner's attorney, James Verner, "stipulating" that Judge Nicholson correctly reflected the testimony of attorneys Lake and Parr as given during the post-conviction hearing.)

**13.** Judge Nicholson also held that the petitioner's claim of a violation of the rule of *Nelson v. Peyton* lacked constitutional merit because of its non-retroactivity, and because the petitioner did obtain appellate review of his conviction by raising the *Nelson* issue on appeal of the post-conviction case, citing *White v. State*, 263 S.C. 110, 208 S.E.2d 35 (1974). Judge Nicholson, after summarizing testimony at the post-conviction hearing, and alluding to the trial record itself, concluded that the claim of ineffective counsel also lacked merit. (Tr. 219).

affirmed such Order, and that court did not, in said opinion, review any impropriety in Judge Nicholson's consideration of the identification claim. Thus, in the context of this particular factual series of events, this court will consider the claimed constitutional error in admission of the identification testimony.

Due to the chronological sequence of events already discussed, this court must undertake a two-tier analysis of the witnesses' identifications to comply with the United States Supreme Court's mandates in this field. In order to set the stage properly for such discussion, some important dates should be reiterated:

> July 13—Petitioner arrested at approximately 1:00 p. m., 1½ hours after Mrs. Neel assaulted.
>
> July 13—Buck Gause identifies petitioner in Columbia on afternoon of arrest.
>
> July 14—Counsel appointed for petitioner.
>
> July 21—Petitioner formally charged in warrant.
>
> July 27—(approximately)—Mrs. Eunice Johnson and her daughter, Shirley Ann Johnson, identify petitioner in Newberry.

■ Considering first the witness Gause's identification, the proper constitutional standard for review has recently been enunciated in *Manson v. Brathwaite*, —— U.S. ——, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Since at the time Gause viewed the petitioner "adversary judicial criminal proceedings" had not yet begun, the Sixth Amendment exclusionary rule applied in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) is inapplicable. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). However, as pointed out in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), even those pretrial show-ups which do not require the strictures of the *Wade-Gilbert* exclusionary rule must still pass constitutional muster under the Due Process Clause.

■ The proper test under the Due Process Clause, as expressed in *Manson v. Brathwaite, supra,* is whether an admittedly, unnecessarily suggestive pretrial identification may, nevertheless, be sufficiently reliable under the "totality of the circumstances" that Due Process is not offended by admission of the challenged evidence. To ascertain such reliability, the Supreme Court has proposed five factors, namely:

(1) the opportunity of the witness to view the criminal at the time of the crime;

(2) the witness's degree of attention;

(3) the accuracy of his prior description of the criminal;

(4) the level of certainty demonstrated at the confrontation, and

(5) the time between the crime and the confrontation.

■ Considering each of the above factors seriatim, in comparison with the confrontation found permissible in *Manson v. Brathwaite, supra,* this court finds:

(1) *Opportunity of the witness to view* —In *Manson*, the witness viewed the defendant for 2–3 minutes standing within 2 feet of the respondent. It was near sunset but the court found that there was ample natural light. Witness Gause viewed the Plymouth from approximately 70 feet away as it sped by. The lighting was admittedly good, but, nevertheless, Gause only got a fleeting view of the left profile of a man in a speeding car.[14]

(2) *The witness's degree of attention* —Although witness Gause may have paid close attention from his perch on the porch, nevertheless, he was a "casual observer" as distinguished from the witness in *Manson, supra,* who was an undercover agent sent specifically to observe the defendant with the express intention of later describing him in detail.

14. The fact that Gause viewed the suspect near the scene of the crime rather than "during the crime" goes to the weight to be given the inference that one near the scene of the crime is more likely to have committed the crime than one about whom nothing is known.

(3) *Accuracy of prior description*—There is no indication in the record what, if any, prior description Gause was able to give the police. In contrast, the witness in *Manson v. Brathwaite* gave a reasonably detailed description including the suspect's race, height, build, hair texture, and facial features.

(4) *The witness's level of certainty*—Witness Gause said he had "not a bit of doubt" that the man he saw driving the Plymouth was the petitioner. Similarly, the *Manson* witness said "There is no question whatsoever" that the man he identified was the defendant.

(5) *The time between crime and confrontation*—In *Manson*, the confrontation took place two days later, while in the present case, confrontation was on the afternoon of the crime.

Analyzing the above, items (1), (2), and (3) are weaker here than in *Manson v. Brathwaite*, while item (5) may be slightly stronger here, with item (4) being indistinguishable. In addition, following the *Manson* court's directive that the courts weigh these factors against the corrupting effect of the suggestive identification itself, this court feels that the photograph which the witness in *Manson* viewed without police presence is probably less suggestive than witness Gause's show-up identification in the presence of police officers.

■ After reviewing all of these factors and the applicable legal principles, this court has concluded that the identification in this case by the witness Gause was unnecessarily and inherently suggestive, *Stovall v. Denno*, 388 U.S. 302, 87 S.Ct. 1967 (1962), and that the factors required by *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) to ensure reliability have not been sufficiently met; thus, testimony concerning the *out-of-court* identification by Gause should have been excluded. Additionally, since the same factors bearing on reliability of the witness's initial observation used in the *Manson v. Brathwaite* analysis also figure in the determination of whether the *in-court* identification could be purged of the unconstitutional taint of a defective out-of-court identification, this court has concluded that the in-court identification here was the "fruit" of the earlier poisonous out-of-court showup. *Wong-Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), *United States v. Wade*, 388 U.S. 218, 241, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), *Gilbert v. California*, 388 U.S. 263, 272, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

■ The second level of constitutional analysis in this case concerns the in and out of court identifications by Mrs. Eunice Johnson and her daughter, Shirley Ann. Since they did not view the petitioner until after he was formally charged, the *Wade-Gilbert* rule operates to bar absolutely any mention of the *out-of-court* identification made in violation of petitioner's Sixth Amendment right to confrontation with counsel present. *Gilbert, supra*, at 272–273, 87 S.Ct. 1951. Thus, the only issue remaining is whether the *in-court* identifications of these two witnesses can be shown to have been purged of the taint of the constitutionally infirm out-of-court identification. For such in-court identification to be admissible, this court must be convinced that the in-court identifications of petitioner by the Johnsons were the result of their observation of him on July 13, 1967, at their home, rather than a recollection of the events surrounding the showup. For the reasons stated below, it is the opinion of this court that the in-court identifications arose from the observations on July 13, 1967, and were independent of the out-of-court showup.

Mrs. Eunice Johnson talked with the young man who came to her home on the date of the crime. She got a good look at him, and said he was a stranger. She eyed the visitor closely because, as she expressed it (Tr. 82), she was "kind of shy of him in a way."

The fifteen year old daughter of Mrs. Johnson (Shirley Ann) also positively identified the petitioner as the young man who came to their home. She testified that she gave him a glass of water after which she watched him through an open door while ironing, as he talked with her mother (Tr. 88). She remembered details of the conver-

sation, saw him for a minimum estimate of three minutes to a maximum of ten minutes, and watched him leave her yard as he walked away from their home "straight up there towards Mr. Neel's house." (Tr. 89–90). She fixed the time by a television program she was also watching as about 11:25 a. m.

■ While this court feels that there is merit to the view that probing a witness's mind to separate showup-related memories from event-related memories is "practically impossible," *United States v. Wade*, 388 U.S. 218, 248, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (Black, J., dissenting in part and concurring in part), separation must be made by following direction from the United States Supreme Court. Considering the Johnsons' opportunity to observe the visitor at their home and their avowed close scrutiny, this court is convinced that each of them could have identified the petitioner as the man at their home on July 13, 1967, without having attended the unconstitutional confrontation, and that they were not influenced by the prior showup.

Having decided that the Gause testimony and the Johnson out-of-court identification were invalid, this court must decide whether or not admission of this testimony constituted "harmless error."

■ The rule established in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), is that constitutional error will not be considered harmless unless a court is satisfied beyond a reasonable doubt that "the error complained of did not contribute to the verdict obtained." One method used to satisfy this test is to determine if the excludable evidence was "merely cumulative," *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), and to meet such determination, it is necessary to review the evidence bearing on the activities of the suspect at the scene.

■ As previously discussed, the Johnsons' testimony placed the petitioner at their home, in close proximity to the Neel residence, at approximately 11:30 a. m. The excludable testimony of Gause places

petitioner in Mrs. Neel's car at 12:10 p. m.; however, the unchallenged testimony of Mrs. Myrtle Jones places a black male in Mrs. Neel's car around 12 noon in the same area Gause said he saw the petitioner. Additionally, Mrs. Dot Bagwell, riding with Mrs. Jones, identified the petitioner at trial as the man riding in the car, based solely on her observation of him during the event. While it is impossible for this court to know absolutely what effect Gause's testimony had on the jury's verdict, it is convinced beyond a reasonable doubt that the Gause testimony played no controlling or contributing part in the final verdict; indeed, this court feels that the jury placed far more weight on other factors in the evidentiary chain, such as:

(1) The presence of petitioner in Mrs. Neel's car with Mr. Neel's gun 1½ hours after the robbery;

(2) Petitioner's possession of the same amount of money in the same denominations as possessed by Mrs. Neel;

(3) Petitioner's white shirt, the only distinctive feature noted by Mrs. Neel before being knocked unconscious;

(4) Petitioner's hostile activity upon wrecking Mrs. Neel's car and being confronted by the police;

(5) The Jones and Johnson identifications.

After a searching review of all the evidence in this case, and the applicable legal principles, this court is firmly convinced that the admission of the Gause identification and the out-of-court identification by the Johnsons was entirely harmless in view of the absolutely overwhelming admissible evidence of guilt. Therefore, it is

ORDERED, that the petition for a writ of habeas corpus is denied.

AND IT IS SO ORDERED.