660 F.2d 1070
 UNITED STATES of America, Plaintiff-Appellee,
v.
Juan MESA, Antonio Oliva, Raymond Morales, Alfredo Vasquez,
Florentino Cubria, Gillardo Miguel Torres, Alex
Narcico Velazquez and Omar Triana,
Defendants- Appellants.
 No. 80-5575.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Nov. 12, 1981.
 Humberto J. Aguilar, Asst. Public Defender, Miami, Fla. (Court-appointed), for Mesa.
 Donald E. Mates, Miami Beach, Fla., for Torres and (Court-appointed), for Triana and Valazquez.
 Alvin E. Entin, Ronald A. Dion, Miami, Fla., Clyde M. Taylor, Jr., Tallahassee, Fla., for E. Oliva, Vasquez, Cubria, A. Oliva, Morales and Lavendero.
 Paul Lazarus, Linda Collins Hertz, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.
 Appeals from the United States District Court for the Southern District of Florida.
 Before HILL, Circuit Judge, SMITH**, Judge, and HENDERSON, Circuit Judge.
 HENDERSON, Circuit Judge:
 
 
 1
 The appellants were convicted by a jury in the Southern District of Florida of conspiracy to possess with intent to distribute, and possession with intent to distribute 10,000 pounds of marijuana. 21 U.S.C. §§ 846, 841(a)(1). The facts are rather complex but are summarized to facilitate a better understanding of the events surrounding this episode.
 
 
 2
 Pablo "Chico" Ruiz, a Florida Marine Patrol officer, was approached by Alfredo Vasquez, a Key West city policeman, and asked whether he would provide protection for a marijuana off-loading operation. Ruiz' task was to furnish security for the operation's activities on the water and protection from other marine patrol officers. In exchange, Ruiz was to receive $25,000.00. Vasquez assured Ruiz that other law enforcement officers were involved in the scheme. Ruiz purported to accept Vasquez' offer and immediately reported the conversation to the United States Custom's office. Subsequently, he participated in a series of meetings with the conspirators to prepare for the impending venture. All of the appellants, as well as several policemen not parties to this appeal, were implicated in the discussions of the details of the illegal plan.
 
 
 3
 It was contemplated that the off-loading would occur around 11:00 p.m. at piers owned by Ming's Seafood. The marijuana was to be transferred from the vessel "Goldstar" to a van and two campers. Various members of the Key West city police department and the Monroe County sheriff's office were to maintain surveillance by land.[1] Morales was to serve as a "lookout" at a phone booth near Ming's. At the appointed time, Ruiz drove one of the campers to the site while Vasquez picked up appellants Torres, Mesa, Triana and Velazquez in the other camper. Upon his arrival at Ming's, Ruiz observed appellants Cubria and Oliva unloading marijuana. When the camper operated by Vasquez reached Ming's dock, he and Ruiz started to walk away from the off-loading site. They were passed by two carloads of law enforcement officers who were on the way to raid the loading party pursuant to the information previously received from Ruiz. The raiders apparently took the defendants by complete surprise. Antonio Oliva was observed unloading bales of marijuana. A shot was fired in the air as off-loaders jumped into the water. Cubria was arrested hiding behind some lobster traps near the "Goldstar." Triana was arrested while stepping into the camper with a bale of marijuana on his shoulder. Mesa and Velazquez were inside the camper amid some forty additional bales. The only defendants not arrested at the scene were Morales, who was acting as a "lookout," and Vasquez, who suddenly took up jogging when he saw the raiding officers move in.
 
 
 4
 Various groups of appellants raise a number of issues on appeal. Because we believe that all of the claims lack merit, we affirm.
 
 
 5
 The appellants mount a variety of attacks on the sufficiency of the evidence. Morales, Velazquez and Triana contend that there was insufficient evidence of their involvement in the conspiracy to permit hearsay statements of co-conspirators to be used against them and that the government failed to show their connection with the conspiracy by a preponderance of independent evidence. Triana and Velazquez claim that because of this deficiency, the trial court should have granted their motion for severance. Finally, Mesa, Velazquez, Morales and Triana join in asserting that the evidence as a whole is insufficient to support the convictions. It is settled law that there must be substantial independent evidence demonstrating the existence of a conspiracy and a defendant's participation in it before co-conspirators' statements may be admitted against him. At the close of the trial,
 
 
 6
 the court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the conspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy.
 
 
 7
 United States v. James, 590 F.2d 575, 582 (5th Cir.) (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); United States v. Horton, 646 F.2d 181 (5th Cir. 1981); United States v. Ricks, 639 F.2d 1305 (5th Cir. 1981); United States v. Grassi, 616 F.2d 1295 (5th Cir.) cert. denied, --- U.S. ----, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). If the co-conspirator's statements are admissible, the court may consider them in determining whether the evidence, when viewed in a light most favorable to the government, would permit a reasonable jury to find guilt beyond a reasonable doubt. E. g., United States v. Richards, 638 F.2d 765 (5th Cir. 1981).
 
 
 8
 Here, the evidence was sufficient to satisfy all three standards. Triana, Mesa and Velazquez were all arrested at the scene. Triana was observed carrying a bale of marijuana into the Winnebago camper, and Mesa and Velazquez were inside the vehicle surrounded by more bales. These three appellants claim that these facts show only "mere presence" and, hence, does not suffice to connect them with the conspiracy. See United States v. Soto, 591 F.2d 1091 (5th Cir.), cert. denied, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979). While they are correct in asserting that "mere presence" at the scene of a crime, standing alone, is insufficient to support an inference of participation in a conspiracy, it is also true that a conspiracy may be demonstrated by circumstantial evidence and it is for the jury to make or reject inferences supported by proof. E. g., United States v. Ayala, 643 F.2d 244 (5th Cir. 1981); United States v. Horton, 646 F.2d 181 (5th Cir. 1981); United States v. Fitzharris, 633 F.2d 416 (5th Cir. 1980) cert. denied, --- U.S. ----, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981). The cases cited by the appellants are clearly distinguishable. In those cases, the presence at the scene stood alone and circumstances were such that a hypothesis of innocence was reasonable. E. g., United States v. Reyes, 595 F.2d 275 (5th Cir. 1979); United States v. Soto, supra; United States v. Littrell, 574 F.2d 828 (5th Cir. 1978); United States v. Zule, 581 F.2d 1218 (5th Cir. 1978). In the instant case, the appellants' presence among numerous bales of marijuana at a late night off-loading operation does not permit a reasonable inference of innocence. See United States v. Perez, 648 F.2d 219 (5th Cir. 1981). As in the classic example of a child who is caught with his hand in the cookie jar, their activity amounted to more than "mere presence." Proof of such a compromising position makes any hypothesis of innocence unreasonable and the conviction must stand. See United States v. Perez, supra; United States v. Soto, supra. Since this evidence alone was sufficient to convict Triana and Velazquez, the district court was correct in admitting co-conspirator's statements against them and denying their motion to sever.
 
 
 9
 Morales, who was not present at the pier, is in a different position with respect to co-conspirator's statements. Nevertheless, there is substantial circumstantial evidence to link him to the conspiracy. In the days preceding the crime, Morales engaged in a number of conversations at pre-arranged sites with various combinations of the conspiratorial group. He picked up Ruiz and rode with him to a restaurant where the conspirators met in final preparation for the transfer of the contraband. The van seized at the scene was registered to Morales' brother-in-law. In addition, when a member of the group assured Ruiz that the plan could be discussed in front of Morales because he was "one of us a brother," Morales smiled and shrugged his shoulders in agreement. This is more than enough evidence to justify the use of the statements of co-conspirators against him. See United States v. Horton, 646 F.2d 181 (5th Cir. 1981). The co-conspirators' statements thoroughly implicated Morales and the evidence clearly sustains his conviction.
 
 
 10
 Vasquez, Morales, Cubria and Oliva assign as error the trial judge's refusal to direct that Ruiz, the government's informant, reveal his home address without first conducting an in camera hearing. At a bench conference out of the jury's hearing, the prosecuting attorney stated that Ruiz had received threats and that a "contract" had been taken out on his life. The government also informed the court that Ruiz had complained that an unidentified person approached him during a recess and that the stranger made a threatening sign by drawing his index finger across his throat. The appellants do not claim that it was error to restrict their cross-examination if the government's representations were true, e. g., United States v. Hansen, 569 F.2d 406 (5th Cir. 1978); United States v. Avalos, 541 F.2d 1100 (5th Cir. 1976), cert. denied, 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977), but rather assert that an in camera hearing was necessary before denying the request. They have not, however, demonstrated any prejudice because of the trial judge's decision to handle the matter at a bench conference. Circumstances alone often give the government some interest in protecting the witness's home address where the witness is an informer in a drug case. United States v. Hughes, 658 F.2d 317 (5th Cir. 1981). The judge was aware that Ruiz was afraid for his family and that he was testifying against former law enforcement officers who had had firearms confiscated and were allegedly involved in a large scale smuggling scheme. The court's awareness of these circumstances would not have been changed by an in camera hearing. It is unrealistic to expect the government to have concrete evidence of an arrangement to kill a witness. There is no claim that the government acted in bad faith and the record of the bench conference is available for review. Cf., United States v. Goodwin, 625 F.2d 693 (5th Cir. 1980) (a separate evidentiary hearing is not required to dispose of claims of governmental intimidation of a witness). Furthermore, contrary to the appellants' contentions, we are unable to confirm that other circuits require an in camera hearing. See, e. g., United States v. Fife, 573 F.2d 369 (6th Cir. 1976); United States v. Rangel, 534 F.2d 147 (9th Cir.), cert. denied, 429 U.S. 854, 97 S.Ct. 147, 50 L.Ed.2d 129 (1976); United States v. Varelli, 407 F.2d 735 (7th Cir. 1969). We also note that at no time did the appellants request an in camera hearing or object to a resolution of the matter before the judge outside the presence of the jury. Our standard of review then, is one of plain error, which is clearly not present here. Fed.R.Crim.Pro. 52(b).
 
 
 11
 These appellants would not have been prejudiced even had an in camera hearing been required. The critical question in deciding if a witness must divulge his address is whether or not the defendant has been given sufficient opportunity to place the witness in his proper setting. Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); United States v. Alston, 460 F.2d 48 (5th Cir. 1972). This determination is committed to the sound discretion of the trial court. Alford v. United States, supra; United States v. Contreras, 602 F.2d 1237 (5th Cir.), cert. denied, 444 U.S. 971, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979). Ruiz testified that he was residing in Miami where he had moved at the suggestion of the government and that he had purchased a single family home for $52,000.00. He further stated that he was employed as a security guard and furnished the name of his employer. Ruiz had only lived in Miami for six months and the defense knew his former address in Key West. Under these circumstances, the appellants had ample opportunity to identify the witness with his environment. United States v. Contreras, supra; United States v. Avalos, supra; United States v. Crockett, 506 F.2d 759 (5th Cir.), cert. denied, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975); United States v. Alston, 460 F.2d 48 (5th Cir.), cert. denied, 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972).
 
 
 12
 All of the appellants except Mesa challenge the trial judge's refusal to grant a new trial on the basis of alleged Brady violations by the government. Prior to the commencement of the trial, the prosecutor learned that one of the government's witnesses, Captain Ralph Tingley, was under investigation by the Florida Department of Law Enforcement. The prosecutor purposefully avoided determining the purpose of the investigation but did ascertain from the investigators that Captain Tingley had not been charged with a crime and that Tingley was unaware of the investigation. The prosecutor did not share this information with the defense attorneys and he requested the state agency to hold the investigation in abeyance pending the trial. At the trial, Tingley testified that he saw appellant Vasquez walking away from Ming's Seafood with Ruiz and that he saw Antonio Oliva transferring bales of marijuana from the "Goldstar." Tingley also rebutted an attack on Ruiz' veracity by testifying to his good character.
 
 
 13
 The appellants claim that the government's failure to disclose that Tingley was under investigation warrants a new trial. In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that failure to disclose material evidence favorable to the defendant violates the Due Process Clause and requires reversal. Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); Sellers v. Estelle, 651 F.2d 1074 (5th Cir. 1981). The judicial emphasis is consistently placed on materiality. In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court recognized three distinct types of situations in which the Brady doctrine applies and enumerated standards for determining materiality in each circumstance. First, where the prosecutor knows or should know that the conviction is based on false testimony, a new trial is mandated if there is a reasonable likelihood that the false testimony could have affected the jury verdict. Second, if there is no disclosure of information despite a specific defense request, the test is whether the suppressed evidence might have affected the outcome of the trial. Finally, in the event of a general request for Brady material or no request at all, a new trial is necessary if the omitted evidence, when viewed in the context of the entire record, creates a reasonable doubt that did not otherwise exist. This circuit recognizes yet another circumstance in which Brady controls: when the prosecutor fails to disclose purely impeaching evidence not affecting a substantive issue and absent a specific defense request, relief will be granted only if the defendant can demonstrate that the undisclosed evidence probably would result in an acquittal. United States v. Auten, 632 F.2d 478 (5th Cir. 1981); United States v. Martino, 648 F.2d 367 (1981); United States v. Anderson, 574 F.2d 1347 (5th Cir. 1978); Garrison v. Maggio, 540 F.2d 1271 (1976), cert. denied, 431 U.S. 940, 97 S.Ct. 2655, 53 L.Ed.2d 258 (1977).
 
 
 14
 Captain Tingley's testimony falls into two of the described categories. Tingley's evidence against Vasquez and Oliva was substantive and the investigation was not the object of a specific defense request. Reversal is demanded if the evidence of the investigation of Tingley, when viewed in the context of the whole record, creates a reasonable doubt that is not otherwise present. In this instance, it does not. Tingley's testimony concerning Vasquez and Oliva was corroborated by other witnesses and the undisputed facts of the case. The reference to Ruiz' good character falls into the fourth catagory recognized by this circuit because the evidence of the investigation could only be used to impeach Tingley. Viewed in this light, we are not convinced that the undisclosed evidence probably would have resulted in an acquittal. The jury chose to believe Ruiz despite his own admission that he had lied concerning the case and in the face of the testimony of other policemen that he had a poor reputation for honesty. The jury's decision undoubtedly resulted from the strong circumstantial evidence which confirmed Ruiz' version of the occurrence. It is unreasonable to think that the impeachment of a character witness would have produced a verdict of acquittal. See United States v. Martino, 648 F.2d 367 (5th Cir. 1981).
 
 
 15
 We do not, however, condone the affirmative act of the prosecutor in requesting the state authorities to stop the investigation of Tingley during the pendency of the trial. But under the circumstances of this case, the information withheld was not material so as to necessitate a new trial. See United States v. Martinez, 604 F.2d 361 (5th Cir. 1979), cert. denied, 444 U.S. 1034, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980) (improper governmental conduct does not necessarily prejudice the defendant).
 
 
 16
 Torres, Velazquez and Triana maintain that the district court erred in denying their motion for new trial based on newly discovered evidence. During the trial, Joseph Valdez, a defense witness, testified that he had told Sheriff William Freeman that Ruiz, the government's star witness, was under investigation for alleged smuggling. Freeman, called by the government as a rebuttal witness, denied such a conversation. After the trial, defense counsel mysteriously received a tape in the mail which depicts a voice allegedly belonging to Valdez speaking with Freeman in which Valdez tells Freeman that Ruiz is under investigation.
 
 
 17
 A motion for a new trial founded on newly discovered evidence is addressed to the sound discretion of the trial court and the denial of such a motion will be reversed only where it is shown that the ruling is so clearly erroneous as to amount to an abuse of that discretion. Fed.R.Crim.P. 33; United States v. Martino, 648 F.2d 367 (5th Cir. 1981); United States v. Antone, 603 F.2d 566 (5th Cir. 1979). Five elements must be present in order to justify such extraordinary relief:
 
 
 18
 (1) The evidence must be discovered following trial;
 
 
 19
 (2) The movant must show due diligence to discover the evidence;
 
 
 20
 (3) The evidence must not be merely cumulative or impeaching;
 
 
 21
 (4) The evidence must be material to the issues before the court; and
 
 
 22
 (5) The evidence must be of such a nature that a new trial would probably produce a new result.
 
 
 23
 United States v. Martino, supra; United States v. Geders, 625 F.2d 31 (5th Cir. 1980); United States v. Williams, 613 F.2d 573 (5th Cir.) cert. denied, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980). The facts before us do not measure up to these standards. First, there has been no showing of due diligence in discovering the evidence. Valdez was a defense witness and he obviously knew of the existence of the tapes. A persistent effort, therefore, would almost certainly have revealed the existence of the tape to defense counsel. United States v. Massey, 629 F.2d 1084 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981). Next, the evidence on the tapes would serve only to impeach Freeman. Additionally, in light of the overwhelming evidence against the appellants, it cannot be seriously contended that testimony tending to impeach a rebuttal witness for the government would probably produce a different result at a new trial. United States v. Williams, supra; United States v. Antone, supra.
 
 
 24
 Vasquez, Morales, Cubria and Oliva complain that the trial court erred in instructing the jury on concealment.[2] Specifically, they insist there was insufficient evidence in the record to support a concealment charge. See United States v. Myers, 550 F.2d 1036 (5th Cir.), cert. denied, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). The transcript of the trial discloses that after the raid, Vasquez and Morales had a conversation with Robert Lastres of the Key West police department. As a result of this communication Lastres rented a hotel room under an assumed name and gave the key to the appellants. They were visited in the room by several police officers, one of whom was told by the appellants that they did not want to be embarrassed by an arrest at home and wanted to surrender as soon as arrest warrants were issued.
 
 
 25
 While the jury could have found an innocent motive from these actions, the evidence also supports an inference of an attempted concealment. The fact that the record might sustain either inference does not make the concealment instruction erroneous. United States v. Hernandez-Miranda, 601 F.2d 1104 (9th Cir. 1979). Also, evidence of flight or concealment is not an element of the crime, but only circumstantial evidence for the jury to consider and therefore need not be proved beyond a reasonable doubt. Id. Here, the instruction was well balanced and the jury could infer concealment from the fact that shortly after the commission of the crime the appellants arranged for the rental of a hotel room under an assumed name in the community of their residences.
 
 
 26
 Finally, Triana, Torres, Mesa and Velazquez object to the admission of the marijuana which was seized from the vessel and campers without a warrant. This claim is completely without merit. The circumstances here present a classic example of the exigent circumstances exception to the warrant requirement. See Roaden v. Kentucky, 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.2d 543 (1925). The appellants' assertion that no exigent circumstances existed because the police could have secured the scene and obtained a warrant presents a faulty view of the events during the raid. The search was not conducted after the scene was under police control but was necessarily carried out during the excitement and confusion created by the raid. At that time conspirators were fleeing, a shot was fired in the air and marijuana was lying in plain view on the ground and in the vessel. There was a very real danger that one of the suspects would attempt to flee in the camper or the boat. In addition, the police were justified in protecting themselves from attack by checking the vessel and camper to insure that no suspects remained inside. See United States v. Moshetta, 646 F.2d 955 (5th Cir. 1981). Under the circumstances, the warrantless search was reasonable under Fourth Amendment tests and the marijuana was properly admitted into evidence. See United States v. Kreimes, 649 F.2d 1185 (5th Cir. 1981).
 
 
 27
 AFFIRMED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 **
 Judge of the U. S. Court of Claims, sitting by designation
 
 
 [1]
 The two sheriff's deputies incriminated by the government's evidence were not indicted. Two city policemen entered pleas of guilty before trial
 
 
 [2]
 The judge charged the jury as follows:
 The intentional concealment of a defendant immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not, of course, sufficient to itself to establish his guilt; but it is a fact which, if proved, may be considered along with all other evidence in determining guilt or innocence. Whether or not evidence of concealment shows a consciousness of guilt, and the significance to be attached to any such evidence, are matters exclusively within the province of the jury.
 In your consideration of the evidence of concealment, you should consider that there may be reasons for this which are fully consistent with innocence. These may include embarassment (sic) at being arrested before family or friends. Also, a feeling of guilt does not necessarily reflect actual guilt. Record, Vol. VIII, at 1509, 10.