**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James Morrow ROPER, Christian Matthew Newton, John Jackson Miller Truxell, Defendants-Appellants.**

**No. 80–7880.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 5, 1982.

Rehearing Denied Oct. 19, 1982.

---

H. Darrell Greene, Marietta, Ga., for Roper.

Neal R. Sonnett, Benedict P. Kuehne, Miami, Fla., for Newton and Truxell.

J. B. Sessions, III, U. S. Atty., Wm. R. Favre, Jr., Asst. U. S. Atty., Mobile, Ala., for the United States.

Before GODBOLD, Chief Judge, MERRITT *, and HENDERSON, Circuit Judges.

HENDERSON, Circuit Judge:

The appellants, James Morrow Roper, Christian Matthew Newton and John Jackson Miller Truxell, along with co-defendants, Jerry Lee Harvey, Tyrus Ramond Cobb and Geraldine Kelleher Martin, were charged by a federal grand jury in the Southern District of Alabama with conspiracy to possess and distribute approximately 100,000 methaquaalone tablets and the substantive offense of possession and distribution of the drugs. 21 U.S.C. §§ 846, 841(a)(1). Before the trial, the district court granted Harvey's motion for a severance from the other defendants and at the conclusion of the government's case-in-chief judgments of acquittal were entered for codefendants Martin and Roper as to the substantive charge. The jury then found all of the defendants guilty of conspiracy and Truxell, Newton and Cobb guilty of possession with intent to distribute. Cobb and Martin are not parties to this appeal.

Frank Acuian, a cooperating informant for the Drug Enforcement Administration (DEA), was approached by Ty Cobb, who was soliciting potential buyers for large amounts of quaaludes. Convinced that Cobb was capable of producing the drugs, Acuian contacted the Baton Rouge Police Department, which in turn notified the DEA. Acuian met with DEA agents and agreed to assist in making a drug bust. He then began negotiating for the sale of a large amount of quaaludes. An undercover Louisiana state trooper was introduced to Cobb as the "money man" and, as a gesture of good faith, Cobb was shown $200,000.00 in cash. The parties then decided on Mobile, Alabama as the site of the sale. Cobb and Martin, his girlfriend, then checked into the Howard Johnson's Motor Lodge (Howard Johnson's) in Mobile and were soon joined by Harvey, who was to assume an increasingly important role in the negotiations. After a series of meetings at which the price and method of exchange were settled, Harvey made airline reservations for "Jack Wilson" to fly from Atlanta to Mobile. "Wilson," it was explained, was to transport the purchase money to Atlanta after the exchange. Harvey drove to the airport to pick up "Wilson," who turned out to be the appellant Roper. On the way back to the hotel, Harvey made a phone call in Roper's presence to Newton and Truxell —Harvey's "Florida connection"—who were staying in a Travelodge in Ocala, Florida. The next day, when the deal was ready to be consummated, a call was placed to the Travelodge in Ocala to request delivery of the pills. Newton and Truxell then checked out of the Travelodge and drove to Mobile. Upon their arrival at the Howard Johnson's, four sealed cartons were quickly transferred to Acuian's car. Newton and Truxell then conferred with Cobb for a few minutes before returning to Florida. They were arrested on the highway and a road map was seized from Truxell's person. Meanwhile, back at the Howard Johnson's, teams of agents began arresting the other conspirators. The sealed boxes which Newton and Truxell had delivered contained 105,300 methaquaalone tablets. Roper now attacks his arrest and the subsequent seizure of evidence used against him. All three appellants claim that the independent

---

* Honorable Gilbert S. Merritt, U. S. Circuit Judge for the Sixth Circuit, sitting by designation.

evidence of conspiracy was not sufficient to permit the use of co-conspirators' hearsay statements and that the evidence failed to sustain the jury verdicts. The appellants additionally challenge the procedure employed by the trial judge in determining their sentences.

Roper contends that the district court's refusal to suppress airline tickets and a pistol found in his motel room violated his constitutional rights because his arrest and subsequent search were made without first procuring warrants. Armed with the knowledge that Roper, then using the alias "Jack Wilson," was the man who flew to Mobile to transport the purchase money back to Atlanta, the agents had probable cause to make the arrest. The arrest, however, was effectuated in a somewhat unusual manner. Acting without a warrant, Agent Gustafson telephoned Roper's room and advised him that "there were armed agents outside of his room and for his own safety and for everyone else's to step outside into the hall, and that he was under arrest." Record, Vol. II at 23. Roper stepped into the hallway with his hands up, was briefly "patted down" for weapons, handcuffed, and immediately escorted back inside the room. Before warning Roper of his rights in accordance with *Miranda v.*

*Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Gustafson asked him if he had any weapons. Roper replied that a handgun was in an unlocked metal brief case on top of the dresser. A loaded pistol was taken from the metal container and Roper was then advised of his *Miranda* rights. At that point, the agents asked Roper if he had any identification. He replied that his identification was inside a zippered shoulder bag lying on a table and told the agent to "go ahead" when asked for permission to open the bag. Record, Vol. II at 34. Inside the shoulder bag were airline tickets which had been used for the flight from Atlanta to Mobile issued to "J. Wilson." Roper's statement concerning the pistol, the weapon itself and the airline tickets were all introduced as evidence against him at trial.[1] Record, Vol. III at 499, 500, 504, 505. Roper assigns as error a *Miranda* violation, improper seizure of the pistol and an invalid search of the shoulder bag. There is no necessity to address the purported infringement of Roper's fourth and fifth amendment rights because we find that the search of the briefcase and shoulder bag were incident to his arrest and even if the search was tainted,[2] the evidence is admissible under the "inevitable discovery" exception to the "fruit of the poisonous tree" doctrine.

1. In denying Roper's motion to suppress, the district court addressed only the issue of probable cause and the legality of the warrantless arrest. The court concluded that probable cause had been shown and that the warrantless arrest was proper because it occurred in a public place (the hallway). Record Vol. II at 194; *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). It is now clear that warrantless arrests in a suspect's home may be effected only under exigent circumstances, *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and that Roper's use of his motel room strictly for lodging insures the same expectation of privacy as if it were his home. *United States v. Bulman,* 667 F.2d 1374 (11th Cir. 1982). Here, the *Payton* rationale cannot be avoided by an instruction that the defendant is surrounded by armed agents and should come out of his room "for his own safety." The record reveals, however, that the simultaneous multiple arrests at the conclusion of the drug transaction and the le-

gitimate fear that Roper would escape, Record, Vol. II at 31, 32, create sufficient exigent circumstances to make the warrantless arrest proper even under *Payton.*

2. Because of our disposition of this issue, we do not consider the propriety of Roper's consent, given at gunpoint, to search the shoulder bag. *See United States v. Phillips,* 664 F.2d 971 (former 5th Cir. 1981). Nor must we decide if an inquiry of the suspect concerning a nearby weapon qualifies as an "interrogation" so as to implicate *Miranda* safeguards. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (defining "interrogation" as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Footnotes omitted.))

In *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court held that the exclusionary rule requires suppression of "fruits" obtained "as a direct result" of an illegal search or an invalid interrogation. The Court noted, however, that evidence is not "fruit of the poisonous tree" if it is not obtained "by exploitation of the illegality" but is come at "instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417. Recognizing that the purpose behind the exclusionary rule is to deter police misconduct and bar untrustworthy evidence, *e.g. Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), the former Fifth Circuit Court of Appeals acknowledged that neither function would be served by excluding evidence which would have been discovered regardless of any alleged unconstitutionality. *United States v. Brookins*, 614 F.2d 1037 (5th Cir. 1980). The *Brookins* court noted that this "inevitable discovery" exception is misnamed in that it is not only applicable where discovery was "inevitable," but also where there was a "reasonable probability" that the evidence would have been discovered by legal means. *Brookins*, 614 F.2d at 1048. We have no doubt that the evidence seized here would have been discovered independently of any alleged unconstitutional questioning or search. It is obvious from the circumstances that DEA agents were initially preoccupied with ascertaining Roper's true identity and if he was armed. The agents knew that other conspirators were in possession of weapons, Record, Vol. III at 473, and that Roper was the "money man" whose assignment was to transport $185,000.00 in cash. It is unreasonable to think that the agents would not have conducted a search of Roper and the area within his control immediately after the arrest. *See Chimel v. California*, 395 U.S. 752, 89 S.Ct.

2034, 23 L.Ed.2d 685 (1969). This conclusion gives rise to the next problem—the constitutionality of such a search.

 Police officers may search an arrested person and "the area into which [he] might reach in order to grab a weapon or evidentiary items," *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and may open containers found within that area. *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Here, however, the arrest occurred in the hall and the items seized were in close proximity to Roper after he was escorted back into his room. Record, Vol. III at 499, 504. In *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), the Supreme Court held that officers could not conduct a lawful search incident to arrest of a suspect's house when the arrest took place on the front steps. In reaching its decision, the Court declined "to hold that an arrest on the street can provide its own 'exigent circumstances' so as to justify a warrantless search of the arrestee's house." *Vale*, 399 U.S. at 35, 90 S.Ct. at 1972. Here, exigent circumstances other than the mere arrest caused the agents to escort Roper back into his room. Roper, Martin, Harvey and Cobb, all staying in rooms on the same hall, were apprehended simultaneously by teams of police officers. Record, Vol. II at 24, Vol. III at 494. Because the hallway had not been secured, staff members and other guests were in the immediate area. Record, Vol. II at 35, Vol. III at 494, 496. The obvious peril created by attempting to arrest a suspected drug dealer in a hallway where other arrests are taking place while bystanders looked on sufficiently established exigent circumstances to justify returning Roper to his room.[3] In this situation, the officers were authorized to search

---

3. Roper asserts that the police should have taken him into a surveillance room "directly across the hall." Brief of Appellant at 26. The record shows, however, that this room was four doors away. Record, Vol. II at 41. In any case, the arrest transpired quickly and "the existence of alternative approaches does not imply that what actually occurred was unrea-

the area within his control for weapons and evidence. *See Washington v. Chrisman,* —— U.S. ——, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982). Because such a search would have materialized had not the police learned of the location of the weapon and Roper's identification by other means, the district court correctly refused to suppress the pistol and airline tickets.[4]

■ Finding that the seized physical evidence was properly admitted does not, however, dispose of the question of the admissibility of Roper's statement concerning the weapon which was arguably admitted in violation of *Miranda,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.[5] We need not belabor this point. Roper's statement that a weapon was in the briefcase was only proof of his possession of the weapon—a fact that was not in dispute at trial and which, in light of the overwhelming circumstances surrounding the pistol's discovery, could not have been in controversy. Under these facts, if the admission of Roper's statement violated the precepts of the *Miranda* decision, such an error was harmless beyond a reasonable doubt. *See Germany v. Estelle,* 639 F.2d 1301 (5th Cir.), *cert. denied,* 454 U.S. 850, 102 S.Ct. 290, 70 L.Ed.2d 140 (1981); *Harryman v. Estelle,* 616 F.2d 870 (5th Cir.) (*en banc*), *cert. denied,* 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980).

■ All the appellants contend that the trial court erred in admitting co-conspirators' hearsay statements against them and claim that the evidence produced at trial was insufficient to uphold their convictions. It is settled law that a trial court can only admit co-conspirators' hearsay statements if it finds substantial evidence, independent of the statements sought to be introduced, showing that the defendant was a member of the conspiracy and that the statements were made in furtherance of the conspiracy. *E.g., United States v. Bulman,* 667 F.2d 1374 (11th Cir. 1982); *United States v. Mesa,* 660 F.2d 1070 (former 5th Cir. 1981); *United States v. James,* 590 F.2d 575 (5th Cir.) (*en banc*), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). The district court's assessment of the *James* issue is a finding of fact which will be overturned only if it is clearly erroneous.[6] *E.g., United States v. Bulman, supra; United States v. Hawkins,* 661 F.2d 436 (former 5th Cir. 1981). In determining whether the jury's verdict is supported by the evidence, we look to see whether the evidence, viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed.2d 680 (1942), would permit a reasonable jury to find guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547 (former 5th Cir. 1982) (*en banc*). Since hearsay evidence was admitted against Roper, we first consider if the non-hearsay evidence comported with the *James* standard and if so, whether all of the evidence, hearsay and non-hearsay, was sufficient to sustain his conviction. *See United States v. Mesa, supra.* On the other hand, the government's case-in-chief against Newton and Truxell relied exclusively on circumstantial evidence. We view

---

sonable." *United States v. Mason,* 523 F.2d 1122, 1126 (D.C.Cir.1975).

**4.** As the District of Columbia Circuit observed, "Of course, *Chimel* does not permit the arresting officers to lead the accused from place to place and use his presence in each location to justify a 'search incident to arrest.' " *United States v. Mason,* 523 F.2d 1122, 1126 (D.C.Cir. 1975). We are not faced with this type of extreme conduct in this case. The district court explicitly found that the arresting agents acted in good faith. Record, Vol. II at 194.

**5.** As previously stated, we do not inquire into the propriety of asking a suspect whether he is

armed without first informing him of his constitutional rights. See note 1, *supra.*

**6.** Roper also complains that the district court did not reconsider its initial *James* determination at the close of all the evidence. The second *James* inquiry is required only "on appropriate motion." *United States v. James,* 590 F.2d at 582. Because Roper made no such motion at the trial, he cannot now object to the trial court's failure to reconsider its initial ruling *sua sponte. United States v. Bulman,* 667 F.2d 1374 (11th Cir. 1982).

the evidence against them only in an effort to ascertain the validity of their convictions.

We begin by noting the importance to this case of a shadowy figure using the alias "Steve." Steve was apparently never apprehended and his role in the conspiracy can only be gleaned from telephone records, messages and one-half of a telephone conversation. Harvey remained in constant contact with Steve by telephone. Harvey's half of one such conversation was overheard by an undercover agent and it was clear that the purpose of the call was to report on the progress of the negotiations. Record, Vol. II at 116. Cobb received messages to call Steve and Roper also called him from his hotel rooms in Atlanta and Mobile. The map seized from Truxell disclosed a handwritten notation listing "Steve's" telephone numbers as the same two numbers used by Harvey to reach the mysterious associate. The fact that all of the conspirators except Martin, who played a minor role, remained in constant contact with a third party who obviously knew of the conspiracy and apparently directed its execution is damaging circumstantial evidence indicating complicity by all in the illegal enterprise.

■ Other evidence adduced during the pretrial *James* hearing revealed that Cobb made reservations for Roper, using the alias "Jack Wilson," to fly to Mobile the day before the consummation of the illegal transaction. The confidential informant, acting under Cobb's instructions, rented a room for Roper under the name "Wilson" at the Howard Johnson's, the site of the drug sale negotiations. When arrested, Roper had in his possession airline tickets in the name of "J. Wilson." He was armed with a handgun and attended a meeting with Harvey and Cobb in Harvey's room. He was also present when Harvey placed a phone call to Newton and Truxell, who were then staying at the Travelodge in Ocala. In view of these facts, there was adequate independent evidence to authorize the admission of co-conspirators' hearsay statements against Roper. *See United States v.*

*Bulman, supra.* According to the hearsay testimony, it was Roper's responsibility to transport the money generated by the sale to Atlanta. Record, Vol. III at 387. The evidence sufficiently established his guilt.

In addition to the map containing the phone numbers for "Steve," there was evidence that Newton and Truxell, while still in the Ocala Travelodge, stayed in constant contact with the other members of the party in Mobile. Gov't Exhibits 1, 3, 4, 5, 23. They also called the Atlanta Hilton while Roper was registered there. Record, Vol. II at 218. On the day of the sale, they checked out of their Ocala motel and drove to the Mobile Howard Johnson's carrying sealed cartons containing more than 100,000 pills which were quickly transferred to another vehicle. The pair then met with Cobb for a few minutes before heading in the direction of Florida. Truxell's map also contained the names of other conspirators and a notation of Cobb's room number and the Howard Johnson's phone number. While there was no direct evidence that Newton and Truxell knew of the contents of the sealed cartons, their guilt may, of course, be demonstrated by circumstantial evidence and it is for the jury to make or reject inferences supported by proof. *E.g., United States v. Mesa, supra.* We recognize that it is not enough for the government "merely to establish a climate of activity that reeks of something foul." *United States v. Wieschenberg*, 604 F.2d 326, 332 (5th Cir. 1979). Here, though, the jury could properly have found that the evidence established not only a stench, but also that Newton and Truxell helped to create the odor by their knowing participation in the conspiracy. Their reliance on *United States v. Littrell*, 574 F.2d 828 (5th Cir. 1978) and *United States v. Aguiar*, 610 F.2d 1296 (5th Cir.), *cert. denied*, 449 U.S. 827, 101 S.Ct. 91, 66 L.Ed.2d 31 (1980) is misplaced. In *Littrell*, it was equally reasonable to infer from the evidence that the defendant, who drove a car from which drugs were removed after his departure, was unaware not only of the conspiracy or that he was delivering drugs,

but also that he was delivering anything at all. In *Aguiar* there was no basis for the defendant's complicity other than his presence in a house which was used in the conspiracy. The evidence here goes far beyond that presented in those cases and was sufficient to allow a reasonable jury to find guilt beyond a reasonable doubt. *See United States v. Richards*, 638 F.2d 765 (5th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981).

Finally, Newton, Truxell and Roper challenge the severity of their sentences and the sentencing procedure employed by the trial court in assessing their penalties. They claim that the sentences were not "individualized" and therefore the judge did not properly exercise his sentencing discretion.

■■■ It is well settled that the district court has broad discretion in prescribing sentence. *United States v. Small*, 636 F.2d 126 (5th Cir. 1981); *United States v. Hartford*, 489 F.2d 652 (5th Cir. 1974). Consequently, the severity of a sentence imposed within the statutory limits is insulated from appellate review. *United States v. Clements*, 634 F.2d 183 (5th Cir. 1981); *Herron v. United States*, 551 F.2d 62 (5th Cir. 1977). *See also United States v. Tobias*, 662 F.2d 381 (5th Cir. 1981). Nevertheless, the judicial process by which a sentence is determined is subject to appellate scrutiny. *Clements*, 634 F.2d at 186; *Hartford*, 489 F.2d at 654. *See also Dorszynski v. United States*, 418 U.S. 424, 443, 94 S.Ct. 3042, 3052, 41 L.Ed.2d 855, 868–69 (1974); *Tobias*, 662 F.2d at 388–89; *United States v. Cimino*, 659 F.2d 535 (5th Cir. 1981). There is a duty to exercise this discretion in every case and to give "individual" consideration to each particular defendant. *See Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *Hartford*, 489 F.2d at 654. Reduced to practical terms, this means that the judge must consider the mitigating and aggravating circumstances of every case and then exercise his judgment to "fit the sentence to the crime and

to the defendant." *Hartford*, 489 F.2d at 656, quoting *Stevens v. Warden*, 382 F.2d 429, 433 (4th Cir. 1967). *See Williams v. Oklahoma*, 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959). Thus, appellate courts have disapproved of rigid and mechanical sentencing procedures by which the district court bypasses the defendant's individual circumstances and metes out a sentence based on the category of crime. *See Clements*, 634 F.2d at 186–88; *United States v. Cavazos*, 530 F.2d 4, 6 (5th Cir. 1976); *Hartford*, 489 F.2d at 655. It is against this background of case law that the appellants make their allegations of impropriety.

■■■ Newton, Truxell and Roper received the maximum sentence allowed by the statute. *See* 21 U.S.C. §§ 841(b)(1)(B), 846. At the sentencing hearing, the judge indicated that he would entertain a motion for a reduction of the sentences if the appellants' appeals were affirmed. He went on to state that he felt the maximum was appropriate at that time because in the event the cases were reversed on appeal, the next trial judge would have the freedom to impose whatever sentence he felt necessary. Record, Vol. IV, at 785, 793–94. These statements, considered in the context of the entire record, do not suggest the use of a rigid or mechanical sentencing policy as those terms are generally understood. Presentence reports were ordered and compiled on each defendant. The judge read the reports and, at the sentencing hearing, questioned the defendants and their attorneys on the contents. He gave each defendant a chance to clear up any problems or inaccuracies reflected in the report. There is no suggestion or even allegation that the district court stated that he "routinely" meted out maximum sentences in drug cases. Nor is there any hint of such a consistent disposition in similar cases.

While our review of the sentencing hearing reveals no predisposition on the part of the district judge toward maximum sentences for this type of offense, or evidence of a "mechanical" sentencing approach, we

cannot reconcile the court's announced purpose with the principles enunciated in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). In *Pearce,* the Court adopted the rule that a judge may not impose a more severe sentence after a retrial unless the record discloses "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." 395 U.S. at 726, 89 S.Ct. at 2081, 23 L.Ed.2d at 670. In this instance it is obvious that the sentencing judge exacted the maximum punishment, at least in part, out of a desire to protect another judge's sentencing prerogative in the event of a reversal and retrial. Thus, the second judge would be free to invoke any penalty up to the maximum without following the requirements of *Pearce.* This declared intention of the district court had the practical effect of avoiding the consequences of the *Pearce* mandate and is not consonant with the policy espoused by the Supreme Court. Also, we are not persuaded by the court's offer to reconsider the sentences in a Rule 35 proceeding if the convictions were affirmed on appeal. This statement of the judge amounts to nothing more than a conditional sentence, reserving the final judgment until after the appellate results were known. In this posture, the case must be remanded to enable the district court to exercise his sentencing discretion.

For the foregoing reasons, the judgments of conviction are AFFIRMED, and the case REMANDED for resentencing.