**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                         No. 96-4752

JOSE HERNAN BORDA,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                         No. 96-4753

JAMES DEJESUS MARTINEZ,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                         No. 96-4806

DUVALL HUCKS,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                         No. 96-4807

ORLANDO FRANCO AGUDELO,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 96-4856

LUIS GOMEZ, a/k/a Huevo, a/k/a
Pescado,
Defendant-Appellant.

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CR-95-267-AW)

Argued: September 24, 1998

Decided: May 11, 1999

Before LUTTIG and MOTZ, Circuit Judges, and
BULLOCK, Chief United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Harold Irwin Glaser, Baltimore, Maryland, for Appellant
Borda; Timothy Joseph Sullivan, SULLIVAN & SULLIVAN, Col-
lege Park, Maryland, for Appellant Martinez; Robert Thomas Durkin,
Jr., Baltimore, Maryland, for Appellant Hucks; Barry Earl Schulman,
Brooklyn, New York, for Appellant Agudelo; Neil Ian Jacobs, Rock-
ville, Maryland, for Appellant Gomez. Barbara Suzanne Skalla,
Assistant United States Attorney, Deborah A. Johnston, Assistant
United States Attorney, Greenbelt, Maryland, for Appellee. **ON**

2

**BRIEF:** Lynne A. Battaglia, United States Attorney, Greenbelt, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellants Borda, Martinez, Hucks, Agudelo, and Luis Gomez were convicted of violating 21 U.S.C. § 846, conspiracy to distribute and to possess with intent to distribute cocaine, and 21 U.S.C. § 841, possession with intent to distribute cocaine. In addition, Appellant Martinez was convicted of violating 21 U.S.C. § 963, conspiracy to import cocaine, 21 U.S.C. § 952(a), importation of cocaine, and 18 U.S.C. § 1512(a)(1), witness tampering. Appellant Borda also was convicted of witness tampering. On appeal, Appellants raise numerous evidentiary and procedural challenges. For the reasons set forth below, we affirm.

I.

This case, which culminated in a twelve-week trial below, presents two distinct groups of facts. The first involves the United States' case against all Appellants relating to a cocaine distribution conspiracy. In making this case, the government relied on testimony of eight cooperating witnesses, testimony of a confidential informant known as "Marco Sucre," testimony of undercover and surveillance agents, wiretapped telephone conversations and events captured on audio or video tape, and items of physical evidence seized in the course of the investigation. A second collection of facts surrounds the witness tampering charges levied against Appellants Borda and Martinez. The government made its case here using similar modes of evidence, namely testimony of a cooperating witness, of Marcos Sucre, and of an undercover agent, as well as evidence of meetings recorded through video tape surveillance.

3

Turning first to the cocaine distribution conspiracy, the government's evidence painted the picture of an extensive cocaine trafficking organization which operated between 1991 and July of 1995, in both Maryland and New York. According to the government, Appellants Borda and Martinez ran the operation.

Juan Mora served as a cooperating government witness, describing the early stages of the collaboration between Borda and Martinez. Mora testified that as early as 1991 Borda had begun transporting drug money to New York City from Maryland. Borda and Mora traveled together between five and seven times to meet individuals in New York named Sarmiento. The Sarmientos are cousins of Borda's wife. On each trip, Borda would carry north as much as $300,000.00 to exchange for ten to twenty kilograms of cocaine, which he would bring back to Maryland. According to Mora, Martinez sometimes made these trips for Borda.

Another witness, Alberto Espinosa, testified that some time in 1991 Borda asked him to locate customers for the cocaine Borda was acquiring from the Sarmientos in New York. In response to this request, Espinosa introduced Borda to Enrique Portillo, for whom Espinosa had been a courier. As a result of this introduction, Borda began supplying cocaine to Portillo.

When Portillo was incarcerated in late 1991, Appellant Hucks, who had been a customer of Portillo, obtained cocaine powder directly from Borda in kilogram quantities. Espinosa testified that this relationship extended into 1992, during which time Borda continued to receive five to ten kilograms of cocaine each week from New York City. According to Espinosa, on at least two occasions Borda and Hucks converted multiple kilograms of cocaine powder into crack. Hucks sold the cocaine he received from Borda to his own customers. For example, Hucks' uncle, James Braswell, testified that Hucks sold him crack cocaine beginning some time prior to 1992 and continuing through 1994. Braswell often exchanged firearms for the drugs, and testified that he gave Hucks over thirty guns, including fully automatic weapons and 9mm handguns.

Espinosa testified that on two occasions in 1993 he mailed cocaine from Colombia, South America, to Borda in Maryland. After return-

4

ing from South America, Espinosa supplied Borda with six kilograms of cocaine. Borda complained that he wanted quantities exceeding twenty kilograms, an amount which Espinosa was unable to handle. Thereafter, Espinosa turned to Martinez and began selling him the amounts of cocaine he could obtain. This relationship continued into 1994.

The government's star witness was Mario Maldonado, who provided key testimony regarding the Borda-Martinez drug operation. He served as a drug courier between 1992 and 1995, a position which granted him the access necessary to give the jury a first-hand account of the inner workings of the drug conspiracy. Maldonado first entered the company of the Appellants in May or June of 1992, when he met Antonio Cubides, another person involved in cocaine trafficking in New York City and Maryland. Maldonado testified that Cubides provided Martinez with one to four kilograms of cocaine each time Martinez made a trip to New York City. Maldonado became a courier for Cubides and estimated that between July and October of 1992 he made five or six trips to New York. In each case Maldonado returned to Maryland with between two and four kilograms of cocaine for Martinez. Martinez then sent the drugs to Borda.

In October of 1992, Cubides, Borda, and Martinez departed for Colombia, South America, where they remained until January or February of 1993. Upon their return, Maldonado resumed his trips to New York City. He testified that every two weeks through May or June of 1993 he delivered approximately ten kilograms of cocaine to Martinez. Martinez continued to pass the drugs on to Borda, who remained a supplier of Hucks.

In June of 1993, Maldonado began working for Borda directly as a courier. Every two weeks from June through October of that year Maldonado transported ten to fifteen kilograms of cocaine from the Sarmientos in New York City to Borda in Maryland, where the drugs were supplied to Hucks. According to Maldonado, Martinez often received two to three kilograms of Borda's cocaine.

Borda and Martinez again went to Colombia, South America, in October of 1993. Maldonado testified that after another break of some four months in making cocaine deliveries for Borda, he renewed his

5

job as Borda's courier after Borda returned to Maryland in February of 1994. He once again traveled to New York every two weeks, each time bringing ten to fifteen kilograms of the Sarmientos' cocaine back from New York to Borda in Maryland.

In May of 1994, Gregorio Sarmiento died. Maldonado testified that Borda continued to buy kilogram quantities of cocaine from Gregorio's sons, Alberto and Fernando Sarmiento. Maldonado continued to serve as Borda's courier, but decreased the frequency of his trips to New York. Thereafter his trips occurred only once a month. Borda began purchasing cocaine from other sources.

Borda again left the United States for Colombia in November of 1994. Borda returned in February of 1995, an event which yet again triggered the resumption of Maldonado's trips to New York City. On his first trip, Maldonado delivered fifteen kilograms of cocaine to Borda. His second trip ended prematurely on February 14, 1995, when he was stopped in New Jersey en route to Maryland with another fifteen kilograms of cocaine. Maldonado was placed under arrest, but agreed to cooperate with law enforcement. Borda and Eduardo Marroquin were arrested the following day while attempting to recover the cocaine Maldonado had in his possession when he was arrested.

In December of 1994, Felipe Ossa joined Martinez on a trip to New York City for the purpose of delivering a drug payment to Alberto Sarmiento. By February of the next year, Ossa had relocated to Maryland, where he soon began transporting drugs at the direction of Martinez. While Borda was in jail awaiting trial he arranged for Martinez to supply Hucks with cocaine. Later that spring, Alfonso Gomez and Amparo Devasquez-Sarmiento followed up on these changed circumstances by traveling to Maryland to meet with Martinez and discuss future cocaine deliveries to him.

This new line of cocaine transport was finalized when Martinez, Ossa, and a paid government informant known as "Marcos Sucre" met with Alfonso Gomez and Devasquez-Sarmiento in New York on April 15, 1995, and established the new procedures for delivering cocaine to Martinez in Maryland. Sucre gained access to these individuals while befriending Martinez.

The first of these new deliveries totaled twenty kilograms of cocaine and was made by Aldemar Gomez, the brother of Alfonso Gomez, on April 18, 1995. At Martinez' direction, Ossa sent one kilogram to an unknown customer and the balance to Hucks, who paid Martinez $430,000.00 in return. On April 23, 1995, Alfonso Gomez and Devasquez-Sarmiento traveled to Maryland to collect payment for the twenty kilograms. They brought with them another fifteen kilograms, of which fourteen were sent to Hucks. When Alfonso Gomez and Devasquez-Sarmiento arrived back in New York with the $430,000.00, they were stopped by police and the money was seized. The infiltration of the Martinez drug ring by Sucre and the initial seizure of money marked the beginning of the end for Martinez and his associates.

On May 1, 1995, Aldemar Gomez came to Maryland to collect payment for the fifteen kilograms delivered on April 23. Videotape surveillance recorded Martinez and Sucre counting $314,000.00 in cash collected from Hucks. This money was given to Aldemar Gomez, who took it back to New York. On May 19, 1995, Aldemar Gomez delivered another twenty kilograms of cocaine to Maryland, again with all but one kilogram going to Hucks. This cocaine was supplied by Appellants Luis Gomez and Orlando Agudelo. Eight days later, Aldemar Gomez embarked for New York with $407,000.00 received from Hucks. Police stopped Aldemar Gomez outside of New York City and seized the cash.

Luis Gomez and Martinez met several times the next month in the presence of Sucre to discuss future deliveries as affected by the problem of the April and May money seizures. According to Sucre, Luis Gomez related to Martinez that Alfonso Gomez and Amparo Devasquez-Sarmiento had been kidnapped and tortured because Luis Gomez did not believe their explanations for the lost money. During these meetings with Martinez, Luis Gomez agreed to supply Martinez with thirty kilograms of cocaine initially and, after payment of $100,000.00, to supply a second thirty kilogram quantity.

On June 24, 1995, Luis Gomez, among others, delivered twenty-six kilograms of cocaine to Martinez and Sucre. Sucre paid the $100,000.00 with government funds. Luis Gomez demanded additional payments, explaining that his boss in Colombia, South Amer-

7

ica, Appellant Agudelo, wanted to recoup the losses suffered by the police seizures and cover the transportation costs of the next delivery. In order to buy time for Sucre, government agents directed Sucre to invite Martinez and Ossa to Miami. Sucre explained to them that he could arrange for the purchase of 150 kilograms of cocaine from Florida sources. Martinez intended to sell fifty of those kilograms to Hucks.

On July 5, 1995, Agudelo arrived in New York from Colombia, South America. Two days later Martinez and Hucks were arrested. On July 8, Luis Gomez and Agudelo were arrested en route to Maryland to collect payment on the twenty-six kilograms delivered June 24.

In July of 1995, a shipping container arrived in Baltimore, Maryland, which had been sent from Colombia, South America. According to Maldonado, Martinez and Cubides had begun formulating a plan in late 1994 to import 100 kilograms of cocaine directly from Colombia. Maldonado had understood that they intended to ship the drugs to Maryland in a shipping container fitted with a false compartment. According to Maldonado, Cubides went to Colombia himself in 1994 to coordinate the plan. When the container in question arrived in 1995, Sucre contended that this was the shipment of cocaine devised by Martinez and Cubides. Authorities searched the container and recovered some thirty-two kilograms of cocaine hidden therein.

As stated above, both Martinez and Borda were convicted of witness tampering. According to Sucre, soon after Borda's arrest in February of 1995, Martinez and Borda began to discuss murdering Mario Maldonado. Sucre testified that Martinez cited the need to kill Maldonado on several occasions and that both Luis Gomez and Hucks volunteered to do so. Government agents sought to protect Maldonado by having Sucre intercede in the plan. Sucre offered to introduce Martinez to a potential hit man, a person who purported to be Sucre's cousin but who was actually an undercover United States Customs Service agent. Martinez provided Sucre with photographs of Maldonado and showed Sucre the neighborhood in which Maldonado resided.

While in Florida, Martinez, Ossa, and Sucre met with the undercover agent on July 5, 1995. At that meeting, which was recorded on

8

video tape, Martinez offered the agent $20,000.00 to kill Maldonado before Borda's trial began.

In total, nineteen individuals were named in two indictments, returned on June 29, 1995, and September 26, 1995, respectively. Of these, six chose to proceed to trial, including the five Appellants and Aldemar Gomez (of the four counts against him, the jury acquitted him on one count of possession with intent to distribute cocaine and could not reach a verdict on the remaining counts). The trial began on April 2, 1996, and lasted twelve weeks, concluding on June 29, 1996, with the jury's convictions of Appellants Borda, Martinez, Hucks, Agudelo, and Luis Gomez on all counts in which they were named. Following sentencing hearings, Borda, Martinez, Hucks, and Luis Gomez were sentenced to life in prison without parole. Agudelo was sentenced to thirty years in prison. All Appellants filed timely notices of appeal.

## II. SEVERANCE

Defendant Borda argues that the district court abused its discretion in refusing to sever his case from that of the other defendants. Borda requested severance prior to trial and throughout the proceedings, especially on the first day of trial after the opening statement by counsel for co-defendant Martinez. The motions were denied by the trial court.

The district court's denial of a motion for severance is reviewed for abuse of discretion and constitutes error only if defendant was deprived of a fair trial and a miscarriage of justice resulted. United States v. Chorman, 910 F.2d 102, 114 (4th Cir. 1990). Although the general rule is that persons indicted together should be tried together, a severance is warranted if a defendant can establish that a joint trial would be fundamentally unfair and unduly prejudicial. United States v. Shuford, 454 F.2d 772, 775-76 (4th Cir. 1971).

Although Borda sought to be severed pre-trial because of the allegedly antagonistic defenses involved, his primary argument on appeal relates to the district court's failure to grant severance based on Borda's supplemental motion for severance following the opening statement by counsel for co-defendant Martinez. The transcript of the

opening statement of counsel for Martinez consists of approximately fifteen pages. Borda's objections to the statement are directed at counsel's brief references to Borda on essentially one page of the transcript; the remaining portions of the transcript consist almost entirely of an attack on the government informant, Marcos Sucre. In reference to Borda, Martinez' counsel said, "This one little investigation involves suppliers, like Hernan Borda, and street-level people like Duvall Hucks developed into this giant conspiracy. The government could have stopped it way back in 1991. They had enough information to bring convictions against people that they knew were participating." The only other mentions of Borda were an admission that Martinez and Borda were Colombians and knew each other, and to the undisputed fact that Borda was arrested in February 1995 in New Jersey. The remainder of the argument consisted of portraying Sucre's alleged cajoling of Martinez to get involved in the conspiracy after Borda was arrested. In fact, counsel refuted the government's contention that Martinez worked for Borda, and argued that he was a "trainee" for Sucre.

Counsel for Borda characterizes this opening statement as so severely prejudicial to Borda as to require severance or a mistrial. Borda characterizes the statement as alleging that Martinez was lured into the conspiracy by Borda, which is not the case. The statement clearly and repeatedly alleges enticement by Sucre, not Borda.

Severance is not required in every instance where co-defendants may have conflicting defenses. As the Supreme Court said in Zafiro v. United States, 506 U.S. 534, 538-39 (1993):

> Mutually antagonistic defenses are not prejudicial per se. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion. [W]hen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. . . . When the risk of prejudice is high, a district court is more likely to determine that separate trials

10

are necessary, but . . . less drastic measures, such as limiting
instructions, often will suffice to cure any risk of prejudice.

506 U.S. at 538-39 (citations omitted). "Speculative allegations as to
possible prejudice do not meet the burden of showing an abuse of dis-
cretion in denying a motion for severance." United States v. Becker,
585 F.2d 703, 707 (4th Cir. 1978). Here, the district judge cautioned
the jury that their verdict should be based only upon the evidence per-
taining to each defendant without regard to the guilt or innocence of
other defendants. Borda has not shown that the defenses or arguments
of his co-defendants were so antagonistic as to be irreconcilable, id.,
and the record does not reveal that counsel for co-defendant Martinez
was doing anything other than fairly commenting on the evidence
expected to be adduced at trial, see United States v. Boyd, 610 F.2d
521, 526 (8th Cir. 1979), cert. denied , 444 U.S. 1089 (1980). Mere
hostility and finger-pointing among defendants does not ordinarily
require severance. See id.

Here, speculative pre-trial allegations pointing to possible prejudice
do not meet the burden of showing an abuse of discretion in denying
a motion for severance, nor do the limited references to Borda made
by counsel for Martinez in his opening statement constitute the kind
of asserted and repeated efforts to discredit another defendant that
require severance. See United States v. DeVeau , 734 F.2d 1023, 1027-
28 (5th Cir. 1984) (references to defendant being"duped" by co-
defendant and to co-defendant as "great con artist" did not require
severance in light of limited nature of comments during month-long
trial and support for comments in record), cert . denied, 469 U.S. 1158
(1985).

## III. IDENTITY OF INFORMANT

Defendants Luis Gomez and Martinez argue that the district court
abused its discretion in permitting a key government witness, "Mar-
cos Sucre," to testify without disclosing his true identity, thus limiting
their ability to cross-examine him.

Ordinarily, the identity of a confidential informant who takes an
active role in the criminal activity itself must be disclosed. Here, the
government sought permission prior to trial to have Sucre testify

11

without disclosing his true name, address, or place of birth, alleging that two co-conspirators had been kidnapped and tortured and that Defendants Borda and Martinez had attempted to have another co-conspirator, Mario Maldonado, killed to prevent him from testifying against them. The government also alleged that during the undercover operation Borda told Sucre that if he was cooperating with law enforcement he would be killed. Attached to the government's motion and submitted ex parte under seal was an affidavit from a United States Customs Service agent who directly supervised Sucre during the investigation, offering additional information indicating that disclosing Sucre's true identity would place Sucre and his family in jeopardy. Certain information about Sucre was provided to the Defendants, however, including the facts that he had no criminal convictions, had been cooperating with law enforcement for a number of years and had been involved in other investigations, had been compensated for his cooperation, and had received or might receive a percentage of the value of certain seizures.

When a trial court is satisfied that there is an actual threat to a witness if his identity is disclosed, courts have held that it is proper to withhold this information. As long as enough information is provided to allow the cross-examiner to place the adverse witness in the proper environment, there is no violation of the confrontation clause. See United States v. Spector, 793 F.2d 932, 937 (8th Cir. 1986); United States v. Mesa, 660 F.2d 1070, 1075 (5th Cir. 1981); United States v. Hansen, 569 F.2d 406, 410 (5th Cir. 1978); United States v. Rangel, 534 F.2d 147, 148 (9th Cir.), cert. denied, 429 U.S. 854 (1976).

Our review of the government's motion, Defendant Martinez' opposition, and the sealed affidavit persuades us that the district court did not abuse its discretion in refusing to order the government to disclose the true name, address, and place of birth of Sucre. The information available to the district court indicated that the government's concerns about Sucre's safety and that of his family were real, and that it was not improbable that revealing his true identity would place his life and the lives of his relatives in jeopardy. Furthermore, the information that the government did make known enabled Defendants' counsel to put before the jury important evidence bearing upon Sucre's credibility, including the fact that he was likely to be compensated further for his activities and testimony.

12

IV. DISCOVERY ISSUES

Defendant Agudelo contends he was denied a fair trial by the government's failure to make available to him notes made by government agents during the debriefing of Marcos Sucre. Sucre's statements were not taken down verbatim by the agent, nor did Sucre sign the notes or any other statement. The debriefings were not recorded. The agent testified that everything in his notes was reflected in the reports provided to defense counsel. Agudelo contends that the government was under an obligation to disclose the handwritten notes as Jencks material, 18 U.S.C. § 3500, Jencks v. United States, 353 U.S. 657 (1957).

The district court conducted an extensive hearing outside the presence of the jury concerning the creation of the agent's notes. After the hearing, the trial court found that the debriefing reports were not ever seen by Sucre, nor did he adopt them as his own.

The purpose of the Jencks act is to afford defense counsel fair access to prior statements of government witnesses that could be used to impeach their testimony on direct examination. United States v. Snow, 537 F.2d 1166, 1168 (4th Cir. 1976). "Statement" is precisely and narrowly defined as "a written statement made by said witness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1). Although Agudelo contends that because Sucre reviewed the debriefing reports he thereby adopted them as his own, the record is clear that Sucre never read nor reviewed the notes or the reports prepared by the agent, and that they were never read to him.

Whether a particular set of interview notes has been"adopted or approved" by a witness is a question of fact for the trial court, which will be reviewed only for clear error. United States v. Smith, 31 F.3d 1294, 1301 (4th Cir. 1994). "Evidence that a government agent has discussed the `general substance' of what the witness said during the interview with him will not suffice to show that the witness has `adopted or approved' the agent's notes of that interview for purposes of § 3500(e)(1)." Id. Accord United States v. Roseboro, 87 F.3d 642, 646 (4th Cir. 1996) (report not Jencks material as to witness even though agent repeated witness's answers to ensure he"had it right"), cert. denied, 117 S. Ct. 694 (1997).

13

To the extent that Agudelo argues that he should have been provided both the notes and reports prepared by the agent because they were "statements" of the <u>agent</u>, we disagree. It is well settled in this circuit that the government need not disclose rough notes which are later incorporated into final reports. <u>United States v. Hinton</u>, 719 F.2d 711 (4th Cir. 1983), <u>cert</u>. <u>denied</u>, 465 U.S. 1032 (1984). As to the final debriefing reports, Defendant must show that they were the statements of the agent which related to the substance of his direct testimony. The record is clear that any reports which related to the substance of the agent's testimony were disclosed. Defendant Agudelo fails to specify with reasonable particularity any reports which he contends should have been disclosed. <u>See United States v. Boyd</u>, 53 F.3d 631, 635 (4th Cir.), <u>cert</u>. <u>denied</u>, 516 U.S. 924 (1995).

## V. EVIDENTIARY ISSUES

### A.

Defendant Gomez contends that the district court erred in admitting into evidence English transcripts of the Defendants' numerous Spanish conversations which were captured on tape by wiretap or by consensual recordings. The translations were prepared by Anna Maria Velasco, a certified court interpreter and college professor holding a Ph.D. in Hispanic languages. Although the transcripts were provided to the Defendants well prior to trial, Defendant Gomez did not prepare an alternate version of the conversations. Furthermore, counsel for Gomez extensively cross-examined Dr. Velasco concerning her translations.

> The district court has wide latitude in determining whether or not the proponent of a tape recording has adequately laid the foundation from which the jury could reasonably evaluate the accuracy, validity, and credibility of the contents of the recordings, and the district court's admission of tape recordings is reviewed for abuse of discretion.

<u>United States v. Wilson</u>, 115 F.3d 1185, 1189 (4th Cir. 1997); <u>see</u> <u>United States v. Capers</u>, 61 F.3d 1100, 1106 (4th Cir. 1995), <u>cert</u>. <u>denied</u>, 517 U.S. 1211 (1996). While transcripts of English conversations are typically used as aids for the jury and not admitted into evi-

14

dence, Wilson, 115 F.3d at 1189, courts have admitted English transcripts of foreign language conversations as substantive evidence in view of the fact that the jury would not understand the spoken language. See United States v. Pena-Espinoza, 47 F.3d 356, 359-60 (9th Cir. 1995); United States v. Garcia, 20 F.3d 670, 673 (6th Cir. 1994), cert. denied, 513 U.S. 1159 (1995); United States v. Gonzalez-Balderas, 11 F.3d 1218, 1224 (5th Cir. 1994).

In this case the district court cautioned the jury with respect to the transcripts of the Spanish language conversations, noting that there was no agreement or stipulation as to the identity of speakers or the accuracy of the transcripts. Under the circumstances, we find that the district court did not abuse its discretion in admitting into evidence the written translations of the Spanish language conversations.

B.

Defendant Gomez also objects to the designation of Detective John Bettinger as an expert, and his testimony concerning codes utilized by the Spanish-speaking Defendants. The district court ruled that the issue was one of weight rather than admissibility. Again, we review the trial court's rulings for abuse of discretion.

At the time of trial, Detective Bettinger had been a police officer with the Montgomery County Police Department for twenty-three years, a large part of which involved working with informants in an undercover capacity utilizing the language and codes of drug traffickers. We believe that Detective Bettinger was properly accepted as an expert given his experience in the field of narcotics law enforcement. Further, we do not find it error to allow Detective Bettinger to offer his opinion, based on the English transcripts, about codes used in conversations conducted in Spanish in view of his extensive experience in narcotics cases involving Spanish-speaking suppliers. See United States v. Hughes, 970 F.2d 227, 235-36 (7th Cir. 1992) (no abuse of discretion at sentencing to permit expert to interpret codes in English translations of Spanish conversations).

Gomez also claims the court erred in permitting Bettinger to use charts which Gomez contends simply summarized the testimony of other witnesses. Although Bettinger testified about approximately

15

eighteen charts, Gomez does not identify the specific charts to which he objects. Many of the charts were simply summaries of voluminous data, such as pen registers, telephone records, and paging intercepts. Another was a pager code chart, prepared to assist in explaining other charts which detailed pager communications among the Defendants on certain relevant days. We do not find that the district court abused its discretion in allowing Detective Bettinger to testify about and produce the charts, especially in view of the opportunity Defendant Gomez had to extensively cross-examine Bettinger. See United States v. Johnson, 54 F.3d 1150, 1157-61 (4th Cir.), cert. denied, 516 U.S. 903 (1995).

C.

Defendant Hucks contends that the district court committed plain error in not allowing him to call as a witness an ex-Metropolitan D.C. police officer, James Bradley, to provide expert testimony "in terms of application for search warrants, execution of search warrants, the means and methods of drug traffickers, and in terms of apprehending and . . . targeting and apprehending drug traffickers." The trial court excluded Bradley's testimony on the grounds that it would "not assist the trier of fact to understand the evidence or to determine a fact that is in issue." We agree, as the district court found, that the general testimony proffered by Bradley was not relevant and would not assist the jury in determining any fact in issue. See Mason v. United States, 719 F.2d 1485, 1490 (10th Cir. 1983) (no abuse of discretion to exclude expert testimony of private detective offered by defendant to show inadequacy of police investigative techniques).

VI. ATTORNEY CONFLICT

Defendant Hucks contends that his first lawyer in this case had a conflict of interest and that the district court erred in not dismissing the indictment against him for that reason. We review the district court's determination de novo, but its factual findings in support of its determination are reviewed for clear error. See United States v. Suntar Roofing, Inc., 897 F.2d 469, 480 (10th Cir. 1990). Hucks' initial counsel, Douglas J. Wood, began representing an individual named Kermit Oliver in July 1995, following his arrest. Oliver had been arrested and prosecuted on drug charges unrelated to the instant

16

case in the Eastern District of Virginia. Wood withdrew from his representation of Hucks on November 28, 1995, because of a conflict of interest having no connection with his representation of Kermit Oliver. On December 21, 1995, after he had been sentenced, Oliver began cooperating with law enforcement officers. When he testified in the present trial Oliver was no longer represented by Wood. (Wood withdrew from representation of Oliver on December 22, 1995.) Thus from July 1995 until November 28, 1995, Wood represented both Hucks and Oliver. Billy Ponds entered his appearance on behalf of Hucks on December 4, 1995, and represented him through trial and sentencing. However, Ponds does not represent Hucks on this appeal. Ponds was made aware that Wood represented Oliver in the Virginia case and cross-examined Oliver in the instant case regarding Woods' representation of Oliver. Following the cross-examination of Oliver, and with the jury out, Ponds moved to dismiss the indictment against Hucks based on the alleged conflict of interest. The court made a preliminary ruling denying the motion, but indicated that if counsel had evidence of any prejudice it should be put in writing and the court would consider it. However, Hucks submitted no further filings.

In Cuyler v. Sullivan, 446 U.S. 335 (1980), the Supreme Court indicated that a defendant who objects to multiple representation must have the opportunity to show that the potential conflict impeded his right to a fair trial. Here, Hucks concedes that he was afforded such an opportunity and that he never followed up on the court's direction that any evidence supporting the alleged conflict be brought to the court's attention in writing. If a defendant fails to show that there is a conflict when given the opportunity "a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel." Cuyler, 446 U.S. at 348. See United States v. Young, 644 F.2d 1008, 1012 (4th Cir. 1981) (applying Cuyler to successive representations and citing it for the proposition that mere possibility of conflict is insufficient to set aside conviction).

As the government points out, Hucks has done nothing more than allege that there might have been a conflict of interest and then speculate that the conflict may have resulted in disclosure of some unidentified communication. As we said in Beaver v. Thompson, 93 F.3d 1186, 1192 (4th Cir.), cert. denied, 117 S. Ct. 553 (1996), "[t]o prevail on a claim of conflict of interest, [a defendant] must present con-

17

vincing evidence of an actual conflict and a resulting adverse effect on performance." There is no evidence that Wood was still representing Hucks when Oliver decided to cooperate with the government. Thus Hucks has failed to show that any conflict he perceived during the short period of time when Wood represented both Hucks and Oliver resulted in any kind of prejudice to him.

## VII. PROSECUTORS' REMARKS

Defendants Agudelo and Luis Gomez also take issue with the government's closing arguments. Specifically, Agudelo objects to the prosecutor's statements that, "Orlando Franco Agudelo. If we didn't get anybody else in this case it was worth it to take somebody like him off the streets" and "He was worth every penny spent in this case." Defendant Gomez objects to the government's focus in its rebuttal argument to allegations of violence, especially to the government stating,

> That's the Huevo [Luis Gomez] everybody was afraid of. That's the Huevo that kidnapped Amparo and Alfonso and put them in a bathtub to torture them, not the quiet one. He doesn't have Mr. Jacobs' personality. Huevo is the one that runs with Paisa, Paisa and the other killers from New York. Those are the individuals you're dealing with. Those are the individuals that Marcos Sucre needs to be protected from.

Agudelo's prosecutorial misconduct claim, for which he made a timely objection, is reviewed under a harmless error analysis. United States v. Loayza, 107 F.3d 257, 262 (4th Cir. 1997). Gomez did not object to the government's arguments in a timely manner, and consequently his claims are reviewed for plain error. Id.

The test by which a claim of prosecutorial misconduct is evaluated consists of two components: (1) the prosecutor's remarks must have been in fact improper; and (2) such remarks must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial. United States v. Mitchell , 1 F.3d 235, 240 (4th Cir. 1993). In the event the court finds a prosecutor's remarks to be improper, reversal is still not warranted unless the comments made were so prejudicial as to make any resulting conviction a denial of

18

due process. <u>Id</u>. A review of the arguments of counsel does not support the Defendants' contentions. Counsel for all parties, Defendants and government alike, gave spirited arguments on behalf of their clients. However, we are satisfied that the isolated comments about which Defendants complain were generally in response to Defendants' arguments, did not constitute misconduct, and even if improper did not rise to a level to have affected the Defendants' substantial rights and deprive them of a fair trial.

## VIII. JURY INSTRUCTIONS

### A.

Defendants Martinez and Agudelo both find fault with the jury instructions given by the trial court. Martinez argues that the district court erred in failing to give an entrapment instruction as to the witness-tampering count and the drug-related counts against him.

A district court's decision whether to give an entrapment instruction is a question of law and is reviewed <u>de novo</u>. <u>United States v. Singh</u>, 54 F.3d 1182, 1189 (4th Cir. 1995). Martinez has made only a perfunctory reference in his brief to failure to give an entrapment instruction on the drug counts. Regardless, we do not believe that Martinez met his burden of producing sufficient evidence from which a reasonable jury could find that the government induced him to commit the offense as charged. When the government merely offers a defendant an opportunity to commit the crime and the defendant avails himself of that opportunity an entrapment instruction is not warranted. <u>United States v. Harrison</u>, 37 F.3d 133, 136 (4th Cir. 1994).

Although Martinez argues that he lacked the pre-disposition to participate in the murder of Maldonado and was induced by Sucre, the evidence clearly indicates that the idea of killing Maldonado originated with Borda and Martinez, and not with Sucre or any other government agent. It was only after it appeared that the murder attempt was imminent that Sucre and the government sought to exert control over the situation by offering an undercover officer as the potential killer. It was not error to deny an entrapment instruction on this count.

19

B.

Agudelo claims that the district court's failure to instruct on multiple conspiracies was an abuse of discretion because there was evidence of several conspiracies--one to distribute narcotics, one to import narcotics, and one to commit a murder. Agudelo was not charged with membership in the conspiracy to import cocaine, Count Two of the indictment, or with involvement in the attempt to kill a witness, Count Four of the indictment.

A multiple-conspiracy instruction is not appropriate unless the proof at trial demonstrates that Defendants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment. United States v. Kennedy, 32 F.3d 876, 884 (4th Cir. 1994), cert. denied, 513 U.S. 1128 (1995). A single conspiracy exists where there is one overall agreement or general business venture, United States v. Leavis, 853 F.2d 215, 218 (4th Cir. 1988), or where there is a permissible inference that each actor was aware of his role in a larger organization. See United States v. Vanwort, 887 F.2d 375, 383-84 (2d Cir. 1989), cert. denied, 495 U.S. 906, and cert. denied, 495 U.S. 910 (1990). We believe the evidence in this case established one overall agreement to distribute cocaine. The evidence indicated that Agudelo's role was that of a supplier in Colombia, South America. On July 8, 1995, three days after arriving in New York from Colombia, Agudelo and Luis Gomez were arrested after traveling from New York to Maryland to collect money owed on a twenty-six-kilo sale. Although the evidence does not show participation by Agudelo early in the conspiracy, it does clearly show one overall agreement to distribute cocaine. It is not unusual for a conspiracy to exist involving multiple suppliers. See United States v. Johnson, 54 F.3d 1150, 1154-55 (4th Cir.) (single conspiracy even though competition for multiple suppliers and customers), cert. denied, 516 U.S. 903 (1995); United States v. Banks, 10 F.3d 1044 (4th Cir. 1993) (single conspiracy even though parallel, and sometimes competing, suppliers), cert. denied, 511 U.S. 1090, and cert. denied, 512 U.S. 1208 (1994); see also United States v. Moten, 564 F.2d 620, 624 (2d Cir.) (single conspiracy even though multiple suppliers, some of heroin and some of cocaine), cert. denied, 434 U.S. 942, and cert. denied, 434 U.S. 959, and cert. denied, 434 U.S. 974 (1977).

Furthermore, even if the evidence had supported Agudelo's claim of multiple conspiracies, he would not be entitled to relief unless he could show that he was prejudiced by the court's failure to give the requested instruction. United States v. Howard , 115 F.3d 1151, 1157 (4th Cir. 1997). Indeed, he would have to show that the "evidence of multiple conspiracies was so strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction." United States v. Tipton, 90 F.3d 861, 883 (4th Cir. 1996), cert. denied, 520 U.S. 1253 (1997). Finally, Agudelo was not entitled to a multiple-conspiracy instruction because he did not advance a multiple-conspiracy theory at trial. United States v. Gray, 47 F.3d 1359, 1369 n.13 (4th Cir. 1995).

IX. JURY DELIBERATIONS

Defendant Hucks argues that the district court erred in allowing the substitution of another district judge while the trial judge was attending a judicial meeting during jury deliberations. It is undisputed that the trial judge stayed in touch with the trial and the substitute judge during deliberations. The Defendant never objected to the trial judge's absence, which had been discussed with counsel on several occasions. A substitution of judges, for which no timely objection is made, is reviewed under a harmless-error analysis. See United States v. Lane, 708 F.2d 1394, 1396-97 (9th Cir. 1983) (although Rule 25(a), Fed. R. Crim. P., not strictly complied with, defendant could not show prejudice). Hucks has failed to show any prejudice to him by the brief substitution of judges or by the substitute judge's failure to excuse a juror during deliberations after consultation with the trial judge. While we believe that the substitution of a different judge from the trial judge during jury deliberations is not ideal, we fail to see how Hucks has been prejudiced in any way.

Hucks also contends that the district court abused its discretion when it did not declare a mistrial when the jury indicated it was deadlocked and instead gave an Allen charge. See generally Allen v. United States, 164 U.S. 492 (1896). No objection was made to the language of that charge.

The decision whether to give an Allen charge is left to the sound discretion of the trial court. United States v. Seeright, 978 F.2d 842,

21

850 (4th Cir. 1992). After eleven weeks of trial, the jury began deliberations on Monday morning, June 24, 1996. Late on Tuesday, June 25, the jury sent a note asking "[i]f a unanimous verdict cannot be achieved on one or more counts or charges, can a unanimous verdict on the remaining charges/counts be rendered?" The jury was then excused for the evening. The next morning, Wednesday, June 26, the jury was instructed to continue deliberating and to review the instructions previously given to them. The following day, Thursday, June 27, just before noon, the jury sent a note indicating that it was hopelessly deadlocked. No additional charge was given that day. On Friday, June 28, in the early afternoon, the jury sent another note advising that it appeared to be "hopelessly deadlocked" and was unable to reach a unanimous verdict on "the twenty-five individual charges." Shortly thereafter, in response to a written question from the court asking if they had reached unanimous agreement on any counts, the jury indicated that it had reached a unanimous verdict on twenty-one of the twenty-five charges. Five of the six Defendants moved for a mistrial. A written Allen charge was then sent to the jury, and the jury was again advised that they would not be required to deliberate beyond the upcoming weekend and then was excused for the night. About 12:35 p.m. on Saturday, June 29, the jury returned a note saying that they remained deadlocked on more than one count of the indictment, that they had been deadlocked on the same counts since Monday, June 24, and that no significant movement had occurred despite four days of serious discussions. Shortly thereafter, the verdict was returned. The jury acquitted Aldemar Gomez on one count and was unable to reach a unanimous decision on the remaining three counts against him. The remaining five Defendants were convicted on the various counts against them.

The record does not support Hucks' claim that the Allen charge and the length of the deliberations coerced a jury verdict. It is clear from the jury's final note that it had been deadlocked on the same counts of the indictment since Monday, June 24, the first day of deliberations. It is also likely from the verdict that the deadlock involved the guilt of Aldemar Gomez, not Hucks. Thus it does not appear that the Allen charge and the length of the deliberations had any effect on the jury at all. For the same reasons the fact that four jurors were concerned about their plans for the following week could not have coerced their decision. This is especially true in that the jurors were

22

advised early on that they would not be required to deliberate beyond the weekend.

## X. SUFFICIENCY OF WITNESS TAMPERING EVIDENCE

Count Four of the amended superseding indictment charged that Defendants Borda and Martinez "did knowingly and unlawfully attempt to kill another person, to wit Mario Maldonado, with intent to prevent the attendance or testimony of any person in an official proceeding, as more fully described in overt acts forty and forty-nine set forth in Count One" in violation of 18 U.S.C.§ 1512(a)(1) and 18 U.S.C. § 2.

Borda and Martinez challenge the sufficiency of the evidence to sustain their conviction. When reviewing the sufficiency of the evidence, the relevant question is whether, after viewing the evidence presented by the government in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982). The government's theory on this count was that following Maldonado's arrest in New Jersey in February 1995 while transporting fifteen kilos of cocaine from New York to Maryland at the direction of Borda, Borda became concerned that Maldonado was cooperating with law enforcement and began to consider, along with Martinez, plans to kill Maldonado to prevent his continued cooperation and testimony at Borda's pending trial. The government's primary witnesses on this count were Sucre and Felipe Ossa.

Sucre testified that Martinez provided photographs of Maldonado to him for delivery to a "hit man," that Martinez showed him where Maldonado lived so that he could pass this information on to the "hit man," and that a fee of $20,000.00 was agreed upon. Furthermore, during a meeting in Miami, Martinez provided Sucre and an undercover officer posing as the "hit man" with additional personal information about Maldonado. Martinez claims that this evidence was insufficient to prove an attempt to kill Maldonado, and that a factual impossibility existed as well.

In order to prove an attempt, the government must first offer evidence that a defendant had the culpable intent to commit the crime.

23

United States v. Neal, 78 F.3d 901, 906 (4th Cir.), cert. denied, 519 U.S. 855 (1996). Once intent is established, the government must next prove that a substantial step was taken to accomplish the intended act. There is no clear line between preparation and attempt, and "[w]hether conduct represents a substantial step depends on the `surrounding factual circumstances.'" Id. However, we believe that Sucre's testimony was clearly sufficient for a rational juror to find that Martinez not only had the intention to carry out the crime, but that he took numerous substantial steps toward its completion, as indicated above.

The evidence as to Borda's complicity in the alleged murder plan is less compelling. Borda was arrested on February 15, 1995, one day after Maldonado's arrest, and was in jail during the time Martinez was actively involved in attempting to arrange Maldonado's murder. However, Felipe Ossa was the contact between Borda and Martinez during Borda's incarceration. Sucre testified that Ossa told him of a telephone conversation Ossa had with Borda in which Borda directed Ossa that he wanted Maldonado killed. Sucre also drove with Martinez to New Jersey for Martinez to visit Borda in jail. Sucre testified Martinez received a letter from Borda which Martinez told Sucre instructed him to do something about Maldonado because Borda's trial was coming up soon and Borda feared Maldonado would testify against him. It was at that point that Martinez began obtaining photographs of Maldonado.

The government asserts Borda's complicity in the murder plan under an aiding and abetting theory. 18 U.S.C. § 2, cited in Count Four, provides that whoever aids, abets, counsels, commands, induces, or procures, or willfully causes the commission of an offense is punishable as a principal. To prove aiding and abetting, the government must show that the Defendant "knowingly associated himself with and participated in the criminal venture." United States v. Winstead, 708 F.2d 925, 927 (4th Cir. 1983). The evidence must show that the Defendant shared the principals' criminal intent. Id. We believe the government produced evidence which, when taken in the light most favorable to the government, was sufficient to allow a reasonable juror to conclude that Borda, from his jail cell, directed, coun-

24

seled and encouraged Martinez and Ossa to have Maldonado killed and therefore aided and abetted in the attempt. **1**

Both Borda and Martinez argue factual impossibility in that they did not have the financial means to provide a $20,000.00 cash payment to anyone who would kill Maldonado. Of course, Borda would obviously have to rely on Martinez to arrange payment. However, this was entirely reasonable in view of the substantial evidence concerning large sums available to Martinez during the same time frame. Moreover, Defendants' arguments are unavailing in view of our holding that factual impossibility is not a defense to an attempt crime. United States v. Hamrick, 43 F.3d 877, 885 (4th Cir.), cert. denied, 516 U.S. 825 (1995).

XI. SENTENCING ISSUES

A.

Defendants Martinez and Luis Gomez contend that the district court erred in imposing their sentences. Martinez alleges that the district court should not have enhanced his sentence for obstruction of justice and for an aggravating role in the offense. Specifically, Martinez contends that his sentence should not have been increased for obstruction of justice because the conduct on which the enhancement was based, the attempted murder of Maldonado, formed the basis for Count Four, witness tampering. Defendant relies on Application Note 6 of United States Sentencing Commission, Guidelines Manual, (USSG) § 3C1.1 (Nov. 1995) (currently Application Note 7), which provides that the enhancement does not apply to an offense which includes as an element obstruction of justice. However, this application note would preclude only the assessment of the obstruction enhancement to the witness tampering count, which the court did not do. Enhancement was applied only in the calculation of Martinez'

_____

**1** It appears that the substantial steps taken by Martinez, a co-conspirator, to have Maldonado killed were taken in furtherance of the drug conspiracy and that the government could have proceeded on the Pinkerton doctrine as well. Pinkerton v. United States, 328 U.S. 640 (1946) (holding each conspirator potentially liable for overt acts of every other conspirator done in furtherance of a conspiracy).

sentence for the drug counts, of which obstruction of justice is not an element.

Although Martinez does not contest the court's factual finding that he was an organizer or leader of a criminal activity that involved five or more participants, or was otherwise extensive, he argues that an enhancement should not have been applied because of "sentencing entrapment and/or sentencing manipulation." Martinez argues that any aggravating role resulted from "the furtherance of and acquiescence and approval of Marcos Sucre." Martinez apparently contends that the government delayed the arrest solely to increase his offense level. However, it is clear that the government is not required to terminate an investigation at the very moment at which it could make an arrest or obtain an indictment. See United States v. Jones, 18 F.3d 1145, 1154-55 (4th Cir. 1994). Martinez' "sentencing entrapment-- sentencing manipulation" arguments are without merit.

B.

Gomez contends that the trial court improperly calculated the quantity of cocaine under the Sentencing Guidelines, improperly designated him as a leader or organizer, and improperly enhanced his sentence for obstruction of justice. After a full sentencing hearing, the district court concluded that Gomez was responsible for over 150 kilograms of cocaine which resulted in a base offense level of thirty-eight; that he was a leader or organizer, which resulted in an increase of four levels; and that he had obstructed justice by misrepresenting his criminal record to the probation officer who prepared the presentence report and by failing to disclose that he had unlawfully returned to the United States after having been deported, which resulted in an increase of two levels. The adjusted offense level was thus forty-four.

A trial court's determination regarding the amount of drugs attributable to a defendant is reviewed for clear error. United States v. Vinson, 886 F.2d 740, 742 (4th Cir. 1989), cert. denied, 493 U.S. 1062 (1990). We are satisfied that there is compelling evidence in the record of the extensive nature of Gomez' participation in multi-kilogram transactions of cocaine, and that the district court was not clearly erroneous in concluding that he was responsible for over 150 kilograms. It is also clear that during the time Gomez was a participant in the conspiracy it involved five or more persons. The govern-

26

ment characterizes Gomez' role as that of a "resident manager" for the drug business in the United States who supervised and directed the local participants. The record amply supports such a characterization. Consequently, it was not clearly erroneous for the district court to enhance Gomez' sentence for his leadership role.

Finally, because it involves interpretation of a guideline term, we

review Gomez' sentence enhancement for obstruction of justice de novo. United States v. Daughtrey, 874 F.2d 213 (4th Cir. 1989). Such an enhancement applies when a defendant provides materially false information to a probation officer relating to a pre-sentence report or other investigation for the court. USSG § 3C1.1, comment. (n.3(h))

(1995) (currently application note 4(h)). Information concerning a defendant's criminal record is considered material. See United States v. Paden, 908 F.2d 1229 (5th Cir. 1990) (failure to disclose portion of criminal history), cert. denied, 498 U.S. 1039 (1991); United States v. Baker, 894 F.2d 1083 (9th Cir. 1990) (failure to disclose prior

conviction).**2** In view of Gomez' admitted lies to the probation officer, which he explained as an attempt to receive a shorter sentence, we find that his sentence was properly enhanced for obstruction of justice.

XII.

We have carefully reviewed the issues raised by the appellants and find them to be without merit. We therefore affirm the convictions and the sentences imposed.

AFFIRMED
_____

**2** A panel of this court in an unpublished decision previously reached the same conclusion as the Fifth and Ninth Circuits. United States v. Kroop, No. 90-5221, 1991 WL 39459 (4th Cir. Mar. 26, 1991) (per curiam).